## IN THE UNITED STATES DISTRICT COURT FOR
## THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **FRAZ KHAN** | § | |
| **PO Box 110251** | § | |
| **Carrollton, TX 75011** | § | |
| | § | |
| **MALIK AND ASSOCIATES, PLLC** | § | |
| **PO Box 110251** | § | |
| **Carrollton, TX 75011** | § | |
| | § | |
| | § | **CIVIL ACTION NO. _____** |
| *Plaintiffs*, | § | |
| | § | |
| **v.** | § | |
| | § | |
| **U.S. DEPARTMENT OF HOMELAND** | § | |
| **SECURITY** | § | |
| **2707 MLK Jr Ave SE** | § | |
| **Washington, D.C. 20528** | § | |
| | § | |
| **U.S. CUSTOMS AND BORDER PROTECTION** | § | |
| **1300 Pennsylvania Avenue** | § | |
| **Washington, D.C. 20229** | § | |
| | § | |
| **U.S. CITIZENSHIP AND IMMIGRATION** | § | |
| **SERVICES** | § | |
| **111 Massachusetts Avenue NW** | § | |
| **Washington, D.C. 20529** | § | |
| | § | |
| **U.S. IMMIGRATION AND CUSTOMS** | § | |
| **ENFORCEMENT** | § | |
| **500 12th Street SW** | § | |
| **Washington, D.C. 20536** | § | |
| | § | |
| **FEDERAL BUREAU OF INVESTIGATION** | § | |
| **935 Pennsylvania Avenue, NW** | § | |
| **Washington, D.C. 20535** | § | |
| | § | |
| **ALEJANDRO MAYORKAS** | § | |
| **SECRETARY OF US DHS** | § | |
| **245 Murray Lane Building SW** | § | |
| **Washington, D.C. 20528** | § | |
| | § | |
| **CHRIS MAGNUS** | § | |
| **COMMISSIONER OF THE U.S. CBP** | § | |

**page 1**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**1300 Pennsylvania Avenue**                         §
**Washington, D.C. 20229**                           §
                                                     §
**UR JADDOU**                                        §
**DIRECTOR OF THE USCIS**                            §
**111 Massachusetts Avenue NW**                      §
**Washington, D.C. 20529**                           §
                                                     §
**TAE JOHNSON**                                      §
**ACTING DIRECTOR US ICE**                           §
**500 12th Street SW**                               §
**Washington, D.C. 20536**                           §
                                                     §
**AND**                                              §
                                                     §
**CHRISTOPHER WRAY**                                 §
**DIRECTOR OF THE FBI**                              §
**935 Pennsylvania Avenue, NW**                      §
**Washington, D.C. 20535**                           §
                                                     §
**.      _Defendants._**                             §

## <u>VERIFIED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

### I.    NATURE OF THE ACTION

1.  This is an action under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for declaratory, injunctive, and other appropriate relief and seeking the disclosure and release of agency records improperly withheld from Plaintiffs by Defendants U.S. Department of Homeland Security ("DHS"), U.S. Customs and Border Protection ("CBP"), U.S. Citizenship and Immigration Services ("USCIS"), U.S. Immigration and Customs Enforcement ("ICE"), U.S. Federal Bureau of Investigation ("FBI"), Alejandro ("Alejandro"), Ur Jadoo ("Jaddou"), Chris Magnus ("Magnus"), Tae Johnson ("Johnson"), and Christopher Wray ("Wray").

2.  With this Complaint for Declaratory and Injunctive Relief (Complaint), Plaintiff(s) challenges Defendants' refusal to conduct a legally adequate search for all responsive agency information as mandated by FOIA, Defendants' refusal to produce all segregable responsive

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

agency information in its possession in violation of FOIA, and Defendants' refusal to produce the lawfully required *Vaughn* index as required by FOIA and D.C. Circuit Court precedent. *See Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir. 1973), *on remand to*, 383 F.Supp. 1049 (D.D.C. 1974), *judgment aff'd*, 523 F.2d 1136 (D.C.Cir. 1975)(The government must provide detailed justification of its exemption claims, and it must specifically itemize and index each document or portion thereof so as to show which were disclosable and which were exempt);

3. *Batton v. Evers*, 598 F.3d 169, 175 (5th Cir.2010) (citing *Cooper Cameron Corp. v. United States Dep't of Labor,* 280 F.3d 539, 543 (5th Cir.2002)("Thus, in a FOIA case, a court 'generally will grant an agency's motion for summary judgment only if the agency identifies the documents at issue and explains why they fall under exemptions.'").

4. This lawsuit is brought due to Defendants' refusal to adequately search for and produce all nonexempt responsive agency information in Defendants' possession, which Plaintiff(s) needs to effectively represent its client; thus, forcing Plaintiff(s) to file the instant lawsuit after Plaintiff's administrative FOIA remedies have been exhausted. In support of Plaintiff's Complaint, Plaintiff(s) alleges as follows:

## II.  JURISDICTION AND VENUE

5. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 5 U.S.C. § 552(a)(4)(B).

6. This Court has jurisdiction over this action pursuant to 5 U.S.C. §552(a)(4)(B) (Freedom of Information Act), 5 U.S.C. §551 *et seq*., 5 U.S.C.§555(b), §702, §704 and §706 (Administrative Procedure Act), and 28 U.S.C. §1331 (federal question) as this action arises under the Freedom of Information Act. 5 U.S.C. §552 *et seq*.

7. The aid of the Court is invoked under 28 USC §§ 2201 and 2202, authorizing a declaratory

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

judgment.

8.  Venue is proper under 5 U.S.C. § 552(a)(4)(B) because Plaintiff(s) brings this action in the District of Columbia.

## III.  TIME FOR DEFENDANTS TO RESPOND

9.  Pursuant to FOIA, 5 U.S.C. § 552(a)(4)(C), Defendants have thirty (30) days to respond to the instant Complaint.

## IV.  PLAINTIFFS OBJECT TO ANY CONTINUANCE

10. Because Plaintiff(s) has been trying to obtain the requested agency information for an extended period of time through multiple administrative FOIA requests, Plaintiff(s) objects to any continuance requested by Defendants in responding to the instant Complaint. Any unwarranted continuance would make FOIA's twenty (20) day mandate for Defendants to produce all responsive agency information to FOIA requesters, and FOIA's thirty (30) day litigation response period, meaningless. *See* 5 U.S.C. § 552(a)(6)(A)(i)-(ii); 5 U.S.C. § 552(a)(4)(C).

## V.  PARTIES

11. Plaintiff Fraz Malik Khan ("Khan") is citizen of United Kingdom and a primary resident of England, United Kingdom. Khan is the primary subject of the requested information.

12. Plaintiff Malik and Associates, PLLC ("MAA") lawfully operates a law office in Carrollton, Texas and is the requestor on all FOIA requests.

13. Plaintiff(s) requested information very specific to Plaintiff Khan, which is in the possession of all Defendants, for the purpose of effectively representing Plaintiff Khan in a legal dispute and controversy. Plaintiff(s) has requested the specific information pursuant to FOIA, 5 U.S.C. § 552.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

14. Defendant U.S. Department of Homeland Security ("DHS") is a department of the Executive branch of the United States Government, and is responsible for securing the nation's borders, in part by enforcing federal immigration laws and managing the immigration process. DHS is an agency within the meaning of 5 U.S.C. § 552(f). DHS has possession, custody, and control of records that are responsive to the FOIA that the Plaintiff(s) has requested.

15. Defendant, U.S. Citizenship and Immigration Services ("USCIS"), a component entity of DHS, is responsible for the administration of immigration and naturalization adjudication, establishing immigration services, policies, and priorities, and has custody and control of alien registration files. USCIS is an agency within the meaning of 5 U.S.C. §552(f). USCIS has possession, custody, and control of records that are responsive to the FOIA that the Plaintiff(s) has requested.

16. Defendant, U.S. Immigration and Customs Enforcement ("ICE"), a component agency within the DHS, is responsible for enforcing federal immigration statutes. ICE is an agency within the meaning of 5 U.S.C. §552(f). ICE has possession, custody, and control of records that are responsive to the FOIA that the Plaintiff(s) has requested.

17. Defendant, Customs and Border Protection ("CBP"), a component entity of DHS, is responsible for maintaining security and staffing ports of entry at the nation's borders. CBP is an agency within the meaning of 5 U.S.C. § 552(f). CBP has possession, custody, and control of records that are responsive to the FOIA that the Plaintiff(s) has requested.

18. Defendant, Federal Bureau of Investigation ("FBI") is the U.S. federal government's lead law enforcement agency.  The FBI is an "agency" within the meaning of 5 U.S.C. § 552(f)(1). FBI has possession, custody, and control of records that are responsive to the FOIA that the Plaintiff(s) has requested.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

19. Defendant Alejandro ("Alejandro") is the Secretary of DHS. He oversees all functions of DHS and its agencies. He is sued only in his official capacity.

20. Defendant Ur Jadoo ("Jaddou") is the Director of USCIS and is sued in her official capacity only. USCIS is a component of the Department of Homeland Security. She oversees all functions of USCIS.

21. Defendant Chris Magnus ("Magnus") is the Commissioner of the CBP. He oversees all functions of CBP. He is sued only in his official capacity.

22. Defendant Tae Johnson ("Johnson") is the Director of ICE. He oversees all functions of CBP. He oversees all functions of ICE. He is sued only in his official capacity.

23. Defendant Christopher Wray ("Wray") is the Director of the FBI.  He oversees all functions of FBI. He is sued only in his official capacity.

## VI.   LEGAL FRAMEWORK

24. FOIA was passed with the intent to allow individuals access to information under government control. When a FOIA request for information is made to a federal government agency, that agency has twenty (20) working days to respond to the request. 5 U.S.C. § 552(a)(6)(A)(i). The agency may grant itself a ten (10) working day extension where "unusual circumstances" exist, but the agency must notify the FOIA requester by "written notice to the person making such request setting forth the unusual circumstances." 5 U.S.C. § 552(a)(6)(B)(i).

25. Where an agency has failed to respond to a FOIA request within the mandated time period, the person making the FOIA request is deemed to have exhausted his administrative remedies. 5 U.S.C. § 552(a)(6)(C)(i). The FOIA requester may then file suit in the federal district court to enforce the Freedom of Information Act. 5 U.S.C. § 552(a)(4)(B). On complaint, the U.S. District Court may "enjoin the agency from withholding agency records and ... order the production of

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

any agency records improperly withheld from complainant" ... "and the burden is on the agency to sustain its action." 5 U.S.C. § 552(a)(4)(B) (emphasis added). Thus, unlike other civil actions where the burden of proof is generally on the plaintiff, in a FOIA lawsuit the burden of proof on every element of the law is on the federal agency defendant to prove by clear and convincing evidence that it did not violate FOIA. *Id.*

26. Plaintiff(s) has exhausted its FOIA administrative remedies with all Defendant. All Defendant have failed to conduct a legally adequate search for all of the requested agency information in their possession. In addition, neither Defendants have produced the requested nonexempt agency information to Plaintiff in its entirety, including the Vaughn index. Therefore, all Defendants are in violation of FOIA, 5 U.S.C. § 552.

## VII.  EXHAUSTION OF ADMINISTRATIVE REMEDIES

27. Plaintiff(s) exhausted administrative remedies by completing Defendants' administrative appeal process for all final FOIA request decisions issued by Defendants pertaining to Plaintiff's requests. Plaintiff(s) is deemed to have exhausted administrative remedies where Defendants have not responded within the prescribed statutory period. 5 U.S.C. § 552(a)(6)(C)(i).

## VIII.    STATEMENT OF FACTS

### Mr. Khan's Background

28. Mr. Khan, a citizen of United Kingdom, was born in Pakistan and is ethnically Pakistani. He has been waiting, for ten years, to legally immigrate to the United States, and has another five years to wait based upon current visa availability for the immigration category under which his petition was filed.[1]

---

[1] A copy of Mr. Khan's petition for an immigrant Visa is not readily available however the reference number for the petition is WAC1290352353 filed on May 21, 2012.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

29. Both of Plaintiff's parents are United States citizens. Plaintiff's now deceased grandfather was also a United States citizen, and his grandmother is a lawful permanent resident of the United States. Plaintiff has uncles and aunts who are United States citizens, and several cousins who are also United States citizens. Plaintiff's brother, A Malik, is a United States citizen residing in Texas. He is an attorney practicing law with the firm Malik and Associates, PLLC ("MAA"), which lawfully operates a law office in Carrollton, Texas and represents Mr. Khan in the instant action.

30. Mr. Khan has never been arrested anywhere in the United States or anywhere else around the world and has no criminal record. He has never violated any visa or immigration law while visiting the United States.

31. Mr. Khan graduated with his Undergraduate Degree from the University of Luton in the United Kingdom in or around the year 2005. Plaintiff graduated with his Graduate Degree from the University of Leister in the United Kingdom in or around the year 2007.

32. After completion of his education, Plaintiff was recruited and employed by Samsung and worked as an executive in the Marketing and sales division in Pakistan. Later, Plaintiff was recruited and employed by Hewlett Packard and worked as an executive in the Marketing and sales division in Pakistan. After that, he worked for Huawei as Marketing and sales executive for Pakistan. Later he also worked for Meizu as a Marketing and sales executive for Pakistan.

33. Through Plaintiff's work, Plaintiff has become a well-known executive in the very small electronic, and media industry of Pakistan based on his marketing campaigns and has become a prominent and well-respected executive in the multinational business community of Pakistan. If his name is googled, his entire work history is revealed on the internet. Key terms used to in google search "'Fraz Malik Khan' Pakistan." There are numerous news articles and pictures that show and confirm his professional and executive background.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

34. Mr. Khan has never been employed by the government of any country or its intelligence services. He has never been otherwise associated with any intelligence services generally or Pakistan's Intelligence Services known as the "ISI" specifically. Mr. Khan has no links to the Pakistani military. There are no conversations on his cell phone that would indicate Mr. Khan conducts any kind of official or unofficial business for the military or the intelligence service.

35. Plaintiff Khan may know some individuals that work for the Pakistan government, Pakistan military, or even for the Pakistan intelligence. This is not uncommon in Pakistan, in fact it is the way of life for executives to run business in Pakistan. This is because in Pakistan, the military plays a crucial part in the running of the civilian government and all private sectors of the country. It is almost impossible to be an executive in any private multinational corporation in Pakistan and not be contacted by the Pakistani military. *See* paragraphs 93-102, below.

### Background Facts Regarding Mr. Malik (Mr. Khan's brother)

36. Mr. Malik, a United States citizen and a licensed attorney in the State of Texas, has built a practice representing individuals in U.S. Immigration and Naturalization matters, including matters brought against Defendants and in removal proceedings. Mr. Malik has represented clients in matters brought against DHS, the FBI, ICE, USCIS, CBP, and the Department of State. During these representations, Mr. Malik holds the Defendants accountable and often files lawsuits or handles administrative proceeding where the Defendants are adversaries, on the behalf of his clients.

37. Mr. Malik occasionally represents clients in criminal and national security investigations. He also represents, and has represented in the past, clients who are under investigation by the FBI. Mr. Malik has previously been employed by DHS through USCIS and ICE. He has also had several employment applications and other dealings and interactions with the FBI.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

38. For many years, Mr. Malik has also been previously targeted by Defendants and other United States agencies (DHS, USCIS, FBI, ICE, CBP) in an effort to discriminate, harass, embarrass, retaliate, scare, and/or seek retribution against him for the work that he does professionally and for other reasons. Mr. Malik has also been targeted in the past due to his national origin, religion, race, ethnicity and other inherent characteristics.

39. As part of his work duties, Mr. Malik travels across the United States and internationally in the representation of his clients. While many of his clients have no criminal history, others have been alleged to have committed significant offenses by Defendants in the past.

40. Mr. Malik's practice requires that he be outside his office to see clients and potential clients. His primary source of communication with clients and potential clients is an iPhone, which he also uses to draft notes, conduct legal research, record legal strategy, record client communications, and access client files and documents.

## Events Giving Rise to Causes of Action

41. In December 2020, Mr. Khan came to visit his family in the United States for two weeks. He had a visa waiver approval and was admitted into the United States for 90-days. Mr. Khan planned a trip with Mr. Malik and a family friend to visit Costa Rica for leisure. They left the United States together for Costa Rica on or around December 31, 2020.

42. Upon their return to the United States on January 3, 2021, Mr. Khan and Mr. Malik were intercepted by the CBP at the DFW airport.

43. Although Mr. Khan and Mr. Malik were traveling together, they both entered separate lines to go through the immigration inspection. Mr. Malik is a United States Citizen and possessed Global Entry Membership. Plaintiff is a British citizen with an approved Visa Waiver Program application. Mr. Khan and Mr. Malik were called in together by an Officer at the immigration

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

counter for the initial inspection. The inspection officer asked some basic questions, inquired about the relationship between the two travelers, processed both Mr. Khan and his brother, and asked them to follow her into the secondary inspection area. The officer escorted both them both to the secondary inspection area and left them there.[2]

44. The inspection area was a secured inspection area and anyone inside the inspection area cannot leave without having the security password and/or a card to unlock the door. While in the Secondary Inspection area, Mr. Khan and Mr. Malik were quickly separated and subjected to intensive questioning by multiple officers.

45. Officer Allen Brock ("Officer Brock") of CBP informed Mr. Malik that he had been randomly selected for review of Global Entry eligibility. He was then interrogated by Officer Sullivan, an Officer of CBP named Allen Brock ("Officer Brock"), and another employee of DHS named Travis Cannon ("Officer Cannon"). The three officers separately questioned him about his law practice, personal life, parents, and immigration history.

46. The officers specifically asked about legal representation he had provided to certain clients and tried to ascertain the identities of certain current and past clients. Mr. Malik answered all questions about his personal life but refused to answer questions about clients that required him to reveal privileged information.

47. Officer Sullivan reacted angrily to Mr. Malik's refusal and requested that he unlock his iPhone. When Mr. Malik refused, explaining that the phone contained extensive attorney-client

---

[2] It is important to note that Khan was moved through many offices throughout the night and the next day. It is possible that some of the interactions from these statements may be inadvertently missing or not in the correct order. This account of the interactions of Khan with the CBP are to the best of Mr. Khan's recollection at the time this statement was taken but by no means included all of them.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

privileged information, Officer Sullivan informed him that DHS was seizing the iPhone and that its digital contents would be searched.

48. After being transferred from the secondary inspection area to the exit, Mr. Malik was threatened with arrest and was physically assaulted by Officer Sullivan. Officer Brock was present, along with at least one other unidentified employee of DHS.

49. Later, Officer Sullivan personally created or directed other officers to create derogatory reports about Mr. Malik and his family members, in order to cause him harm. Specifically, Officer Sullivan intentionally, willfully, and with intent to harm Mr. Malik created records containing false reports and records in United States government databases and disseminated it to other federal agencies under the pretext of national security to evade judicial review. Officer Sullivan requested that false records be created to illegally revoke Mr. Malik's Global Entry. Officer Sullivan was aware that Mr. Malik is an attorney, and that he would likely resort to judicial relief. As such, Officer Sullivan used the above-described tactic, which is regularly employed to target Americans, including lawyers, for retribution against their work.

50. Simultaneously but separately, Mr. Khan was interrogated by or came in contact with several different CBP officers during the course of his detention in the secured area. Among the officers interrogating Mr. Khan were Officers Sullivan, Cannon, Reyes, Viera, DOE etc. As noted in paragraph 15, above, Mr. Khan does not presently know the full names of all of these defendants but will seek leave to amend the Complaint so as to name each appropriate defendant and their employing agency after the completion of additional discovery.

51. At the outset of the interrogation and search, an officer in plain clothes explained that they just wanted to ask Mr. Khan some questions. The officer instructed him to follow him and identify his luggage so they could inspect Mr. Khan's luggage. Once Mr. Khan arrived at the baggage

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

carousel on the first floor, the Officer kept speaking to Khan and kept asking him questions while making small talk. Mr. Khan realized that they were standing at the wrong carousel, Khan pointed it out to the officer know and then they located and moved to the correct carousel.

52. The officer ordered Mr. Khan to bring his luggage and follow him to the customs inspection area. There, the same officer went through and inspected the luggage. While the luggage was being inspected, another officer joined. While inspecting the bag, the first Officer asked Mr. Khan if he was carrying anything unlawful or anything that needed to be declared, to which Mr. Khan responded in the negative.

53. After the inspection of his bag, Mr. Khan was asked to take a seat in the customs inspection area. The officer(s) left and returned with two more officers who were in uniform. The two officers asked Mr. Khan to remove all of the belongings from his person and hand it over to them. One of the officers asked Mr. Khan to provide him with his cell phone, and he complied.

54. After all personal items were taken from Mr. Khan, one of the officers asked Mr. Khan to provide his phone's password. Mr. Khan politely declined, explaining that his cell phone was a private matter. At this time, the first Officer started to become aggressive with Mr. Khan and made physical threats. He threatened to hold him in custody indefinitely and send him to prison unless he shared phone's password with them. Fearful, Mr. Khan provided the password. The officers then left, with Mr. Khan's phone, for about 20 minutes.[3]

55. When they returned, one of the officers asked Mr. Khan if he knew a person by the name of Mohsin Nawaz. Mr. Khan replied by asking who is Mohsin Nawaz. The Officer responded there

---

[3] During a deposition conducted in the case filed against CBP by Mr. Malik on his own behalf, Officer Sullivan testified that he had sent the information and data from Mr. Khan's cellphone to various other law enforcement or intelligence agencies.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

is a contact in your phone identified as Mohsin Nawaz. Mr. Khan explained that there may be about 5000 contacts in his phone all related to his business dealings and he did not know a Mohsin Nawaz right off the bat.

56. Mr. Khan explained that he usually identifies contacts with a reference after the name of the individual. He asked the officer whether there was a reference to Mohsin Nawaz, to which the officer replied "Mohsin Nawaz Ufone." Mr. Khan explained that it must be a person who worked at cell phone provider in Pakistan named "Ufone", and that he himself had been an executive in a multi-national company dealing with cell phone sales. He reiterated that he did not know him personally and that Mohsin Nawaz was not a close personal contact.

57. Subsequently, the officer showed Mr. Khan a picture of an individual and asked him if he knew him. Mr. Khan responded that he did not know the individual in the picture, or at least could not remember off the top of his head.

58. The officer then asked Mr. Khan if he worked for or was connected to Pakistan military's intelligence services known as the ISI, to which Mr. Khan responded in the negative. Mr. Khan explained that as the marketing executive head of a multi-national corporation dealing with cell phones and computer sales, he had dealt with many governmental agencies and government heads, but he had no personal or official dealing with any government heads or offices

59. Mr. Khan further explained that in Pakistan, the Army and the ISI is involved in all facets of life. They review and overlook everything in the country including business and executives. He explained that any contacts he might have with Pakistan's military or intelligence services are business related, and have nothing to do with intel or the workings of the government agencies. He reiterated that this is the way life works in certain countries.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

60. Throughout, Mr. Khan was treated with a significant degree of hostility. The officers referred to Mr. Khan directly, as well as about him to each other, with derogatory terms. Though Mr. Khan was not familiar with many of the terms at the time, he has subsequently learned their meanings and derogatory cultural connotations.  The terms he heard included "terrorist," "sand nigger," "motherfucker," and "son of a bitch." When they would call Mr. Khan by these names, the officers would have a smile on their face or a tone of voice that indicated they were mocking Khan.

61. Every time they spoke about Mr. Malik to Mr. Khan, the officers expressed hate, disgust, and an overt desire to harm him. Mr. Khan has never sensed or observed the level or hatred by anyone that he was subjected to by these CBP officers, especially Officer Sullivan.

62. After this encounter, Mr. Khan was escorted back upstairs within the inspection area, and told to have a seat and wait. While waiting, he asked to see a supervisor. An unknown individual showed up and sat next to Mr. Khan and identified himself as a supervisor. Mr. Khan asked the supervisor what was going on and why he was still being detained. The officer responded: "I have served in Iraq, and I am knowledgeable about how things work." Mr. Khan asked "what things?" The Officer responded: "You know what I am talking about" and that he was not permitted to tell him anyway. Mr. Khan offered to help or offer any information that might help clarify any misunderstanding, but the supervisor seemed uninterested.

63. Another uniformed officer photographed and fingerprinted Mr. Khan, and returned him to the secondary inspection waiting area. There, Mr. Khan was told he would not be allowed into the United States and would be deported. Khan requested a telephone call with the British Consular Officer. An officer who identified himself as Officer Aaron Sullivan escorted Mr. Khan into a private room and took out a hand knife while supposedly dialing a British Consulate Officer. Once

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

Mr. Khan was speaking to the person on the line, Officer Sullivan waved his knife and made gestures as if he were going to stab Mr. Khan. Terrified, Mr. Khan quickly hung up the phone.

64. Another unidentified officer arrived and explained that he wanted to get a statement from Mr. Khan. While conversing with Mr. Khan, the officer wrote things down and asked Mr. Khan to sign a statement. Though Mr. Khan felt his statements had been written down inaccurately and he asked to amend the statement, he was told he could not. While this occurred, Officer Sullivan remained in the room and continued to make threatening gestures toward Mr. Khan and to hold his knife close to Mr. Khan's neck. Mr. Khan answered all questions and signed the statement without being given a chance to properly read the statements properly.

65. Mr. Khan overheard Officer Sullivan stating to another officer that he wanted them to make sure that Mr. Khan is never able to return to the US and to also kill all chances of him immigrating to the United States through his family's petition. He stated that this would show Mr. Khan's brother, Mr. Malik, "what it means to fuck with us."

66. Subsequently, another officer, stated something to the effect of the following: *I know that you are good, but they are doing this because your brother is an attorney. They are making me do all of this, so I have to face your brother and not them. If it was up to me, I would have let you go visit your family but they want to punish you because they cannot do anything to your brother. They know that he is an attorney, and he will come after them, and they want to turn this into a big stink.* This officer apologized to Mr. Khan about the way he was being treated.

67. Officer Sullivan then approached and explained to Khan that because the airport will be closed due to COVID, they will have to move him to the jail overnight. He informed Mr. Khan that when the airport reopened in the morning, he would be returned to his country right away.

page 16

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

68. Mr. Khan was handcuffed, and two police officers escorted him to a jail/holding facility. Throughout the night, Mr. Khan's requests for food or drink were repeatedly refused. At the jail, Mr. Khan was strip searched and kept in the cell without his outer layer of clothes. One of the officers explained that this was done upon the order of Officer Sullivan. Mr. Khan was also refused a warm blanket, even though he was very cold. Mr. Khan was initially placed in a cell with hardened criminals, some of whom attacked him.

69. After being escorted back to the airport in the morning, Mr. Khan was placed in the separate cell with no windows. There was a button in the cell labeled label "in case of an emergency press this." Mr. Khan pressed that button several times over the course of the four to six hours he was in there to beg for food (he could not say exactly how long because his watch and phone had been taken), but he was given no food until Officer Sullivan arrived with a cup of coffee. After Mr. Khan drank the coffee, Officer Sullivan told him he had spit into it.

70. Mr. Khan was advised that he would be put on a flight to the UK that evening. He was told that before he would be allowed to leave the US, he would have an interview with some individual.

71. Mr. Khan was escorted to a room to meet an individual (JOHN DOE ("Mr. Doe") who identified himself only as working for the US Government. Mr. Doe explained that he had suggested to the CBP that Mr. Khan should be allowed to enter the US, but that Officer Sullivan refused to allow it.

72. Mr. Doe tried to recruit Mr. Khan to work for his agency or the US Government. Mr. Khan was astonished to the line of questioning. Mr. Doe told Mr. Khan that he is very influential and asked whether, if he or the US Embassy contacts him, Mr. Khan would be willing to "help us" or "work for us" or go meet someone "for coffee." Mr. Khan replied that if there is anything that was legal and within his ability to do to help, he would be happy to do so.

page 17

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

73. Mr. Doe explained to Mr. Khan he was not being banned by the United States from traveling to the US or restricted - to enter for a certain period of time[4]. He was advised that he could obtain a visa from the United States Embassy right away and re-enter the United States if he wanted, but just could not use the visa waiver program. It is the understanding of the undersigned counsel that this may have been an ICE HSI Special Agent or an FBI Special Agent.

74. Mr. Khan was eventually escorted to a plane. The officer escorting him explained to the flight crew that Mr. Khan was not a troublemaker or a threat, and they would have no issues with him in the plane. Mr. Khan boarded his flight and left the United States.

75. On behalf of Mr. Khan, MAA has submitted FOIA requests for documents, records, data, and information pertaining to Mr. Khan and the January 3, 2021, incident which formed the basis of the requests. All of the requests have produced either no results, partial results, or otherwise have been arbitrarily responded to.

76. Plaintiff has received either no production of information or an arbitrary response from Defendants. In addition, the lawfully required Vaughn index fully describing the search methods employed and individually describing the lawful basis for each exemption on each page of information has not been produced to Plaintiff(s) as mandated by FOIA by any of the Defendants. *See Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir. 1973), *on remand to*, 383 F.Supp. 1049 (D.D.C. 1974), *judgment aff'd*, 523 F.2d 1136 (D.C.Cir. 1975) (The government must provide detailed justification of its exemption claims, and it must specifically itemize and index each document or portion thereof so as to show which were disclosable and which were exempt); *Batton v. Evers*, 598 F.3d 169, 173 (5th Cir.2010)("the district court abused its discretion by failing to order a *Vaughn* index").

---

[4] This same information had been conveyed to Mr. Malik by Mr. Viera (*see* FN 1).

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

77. Other illegal acts committed by Defendants have been uncovered on a regular basis as Mr. Malik, Mr. Khan's brother, sought records and developed testimony in his own related lawsuit. See *Malik et al v. U.S. DHS* et al, 4:21-cv-00088 (N.D.Texas)[5]. All of the illegal actions described herein were taken with the assent and protection provided by CBP Chief Michael Pequano, currently the CBP Port Director at Oklahoma City Airport.

### CBP's History of Misconduct and Impunity

78. CBP has a long history of troubling enforcement tactics and mistreatment of people in its custody. Journalists, human rights observers, and non-governmental organizations— including Mr. Malik —have extensively documented unlawful and abusive policing practices by CBP officials. This includes the use of racial profiling, unjustified shootings and other use of excessive force, as well as unlawful arrests and deportations.[6] CBP created and operates with a "secret division" to target Americans and violate their constitutional and civil rights with a free pass at the borders.[7] CBP created a separate list for lawyers and targeted lawyers, like Mr. Malik, for their work.[8] CBP misconduct, including the use of racially derogatory language and the repeated

---

[5] A decision was recently issued in the case that is being appealed to the 5th Circuit.

[6] *See generally Hold CBP Accountable: Stopping U.S. Customs and Border Protection (CBP) Abuse,* https://holdcbpaccountable.org/abuses/; *see also, e.g.,* John Washington, *"Kick Ass, AskQuestions Later": A Border Patrol Whistleblower Speaks Out About Culture of Abuse Against Migrants,* The Intercept (Sept. 20, 2018), https://theintercept.com/2018/09/20/border-patrol- agent-immigrant-abuse/; Garrett M. Graff, *The Green Monster: How the Border Patrol BecameAmerica's Most Out-of-Control Law Enforcement Agency,* Politico (Nov./Dec. 2014), https://www.politico.com/magazine/story/2014/10/border-patrol-the-green-monster-112220.

[7]    https://news.yahoo.com/cbp-launches-review-secretive-division-that-targeted-journalists-lawmakers-americans-100035634.html

[8] https://www.nbcnews.com/politics/immigration/u-s-officials-made-list-reporters-lawyers-activists-question-border-n980301

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

physical and verbal abuse of individuals in the agency's custody, has caused significant public concern.[9]

79. CBP's concerning tactics have been ongoing for decades.[10]  In July 2019, media outlets reported that thousands of CBP officers were members of a Facebook group in which CBP officers mocked a father and his toddler who drowned while attempting to enter the United States.[11] The same Facebook group members engaged in abusive, racist language about members of Congress— and then attempted to delete the posts.[12] In the same  month, journalists reported that CBP officers forced a noncitizen to walk in front of other detainees    holding a sign identifying himself as

---

[9] *See, e.g.*, American Civil Liberties Union of San Diego & Imperial Counties, et al., *Administrative Complaint Re: U.S. Border Patrol's Verbal Abuse of Detained Individuals* (July 2020), https://www.aclusandiego.org/wp-content/uploads/2020/07/2020-07-07-OIG-Complaint- 4-FINAL.pdf; Garrett M. Graff, *The Border Patrol Hits a Breaking Point*, Politico (July 15, 2019), https://www.politico.com/magazine/story/2019/07/15/border-patrol-trump-administration-227357; Univ. of Chicago Law School Int'l Human Rights Clinic, et al., *Neglect and Abuse of Unaccompanied Immigrant Children by U.S. Customs and Border Protection*, at 10-13 (May 2018),

https://chicagounbound.uchicago.edu/cgi/viewcontent.cgi?article=1001&context=ihrc; Sara Campos & Guillermo Cantor, Am. Immigr. Council, *Deportations in the Dark: Lack of Process and Information in the Removal of Mexican Migrants*, at 13-16 (Sept. 2017), https://www.americanimmigrationcouncil.org/research/deportations-dark; Guillermo Cantor & Walter Ewing, Am. Immigr. Council, *Still No Action Taken: Complaints Against Border Patrol Agents Continue to Go Unanswered*, at 8 (Aug. 2017),

https://www.americanimmigrationcouncil.org/research/still-no-action-taken-complaints-against-    border-patrol-agents-continue-go-unanswered.

[10] *See, e.g.*, Daniel E. Martinez, Guillermo Cantor & Walter Ewing, Am. Immigr. Council, *No Action Taken: Lack of CBP Accountability in Responding to Complaints of Abuse* (May 2014), https://www.americanimmigrationcouncil.org/research/no-action-taken-lack-cbp-accountability-    responding-complaints-abuse; Cantor & Ewing, *Still No Action Taken*, *supra* n. 3 (examining records of alleged misconduct by Border Patrol employees).

[11] A.C. Thompson, *Inside the Secret Border Patrol Facebook Group Where Agents Joke About Migrant Deaths and Post Sexist Memes*, ProPublica (July 1, 2019, 10:55 AM), https://bit.ly/2YyJXfu.

[12] *Id.*; *see also* Ryan Deveraux, *Border Patrol Agents Tried to Delete Racist and Obscene Facebook Posts. We Archived Them*, The Intercept (July 5, 2019), https://theintercept.com/2019/07/05/border-patrol-facebook-group/.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

attracted to men,[13] detained children in poor conditions,[14] sexually assaulted a child in CBP custody, and retaliated against other children for protesting the conditions of their confinement.[15]

80. CBP continually evades responsibility for its actions and operates in a culture of secrecy and impunity. Complaints by migrants who have come forward to raise allegations of verbal, physical, and sexual abuse go unheard and unchecked.[16]

81. Recently, CBP successfully obtained "security agency" status, shielding "all CBP employee names from subsequent responses to [FOIA] requests or other public disclosures for CBP employee data."[17]

82. Building on this trend towards further secrecy, CBP recently sought approval from the National Archives and Records Administration (NARA) to destroy various types of records pertaining to its misconduct.[18] These include documents held by CBP, including witness testimony and other evidence, due to complaints made to the DHS Office of Civil Rights and Civil Liberties

---

[13] Nick Valencia et al., *Border Patrol agents allegedly tried to shame a migrant by making him hold a sign reading 'I like men,' emails show*, CNN (July 4, 2019, 4:58 PM), https://cnn.it/2mPKOes.

[14] Jacob Soboroff & Julia Ainsley, *Migrant kids in overcrowded Arizona border station allege sexual assault, retaliation from U.S. agents*, NBC News (July 9, 2019, 8:30 PM), https://nbcnews.to/2LbfbGP; *see also* Simon Romero et al., *Hungry, Scared and Sick: Inside the Migrant Detention Center in Clint, Tex.*, N.Y. Times (July 9, 2019), https://nyti.ms/2L7dREA.

[15] *See* Soboroff & Ainsley, *supra*.

[16] *See, e.g.*, Martinez, Cantor & Ewing, *No Action Taken, supra* n. 4; Cantor & Ewing, *Still No Action Taken, supra* n. 3.

[17] Ken Klippenstein, *Exclusive: Customs and Border Protection Gains an Extra Layer of Secrecy*, The Nation (Feb. 4, 2020), https://www.thenation.com/article/politics/cbp-security-agency/ (quoting an CBP internal memo obtained by The Nation); Jessica K. Lang, *U.S. Customs and Border Protection Designated 'Security Agency*,' The Nat'l Law Review (Feb. 24, 2020), https://www.natlawreview.com/article/us-customs-and-border-protection-designated-security-agency.

[18] 85 FR 47248, National Records and Archives Administration (NARA), *Notice of Availability of Proposed Records Schedules*, *Request for Comments*; Alice Speri, *Homeland Security Wants to Erase Its History of Misconduct*, The Intercept (Oct. 6, 2020, 11:57 AM), https://theintercept.com/2020/10/06/homeland-security-dhs-misconduct-records-erasure/.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

(CRCL); complaints raised under the Prison Rape Elimination Act (PREA); and internal complaints and criminal investigations concerning CBP personnel. In some cases, records could be destroyed in as soon as four years.[19]

83. Rather than accountability, CBP instead enjoys an astronomical budget of $18.2 billion for FY 2020—a 19% increase over FY 2019—and an increased number of personnel.[20] Most troubling, CBP's reach has gone beyond its law enforcement mandate to patrol the U.S. borders and monitor trade. For example, in April of 2019, DHS surreptitiously implemented a pilot program in which CBP officers were tasked with the unprecedented role of conducting sensitive threshold  screening interviews, known as "credible fear interviews," that determine whether asylum-seekers can present their claims before an immigration judge.[21] This screening role has been historically undertaken by asylum officers, who are trained in asylum law and in dealing with individuals suffering trauma after enduring persecution and arduous journeys to the United States. The assignment of CBP officers to this role drew criticism and concern, given the agency's historical function as a law enforcement agency and its well-documented animosity towards asylum seekers.[22]

---

[19] *Id.*

[20] Executive Office of the President, *Border Security 2020 Fact Sheet: Strengthening BorderSecurity and Immigration Enforcement*,

https://www.whitehouse.gov/wp-content/uploads/2019/03/FY20-Fact-Sheet_Immigration-Border-Security_FINAL.pdf.

[21] *See* Molly O'Toole, *Border Patrol agents, rather than asylum officers, interviewing familiesfor 'credible fear'*, L.A. Times (Sept. 19, 2019, 5:50 AM), https://lat.ms/2mqC263; Julia Ainsley, *Stephen Miller wants Border Patrol, not asylum officers, to determine migrant asylum claims*, NBC News (July 29, 2019, 7:31 PM), https://nbcnews.to/2YpVQni; Nick Miroff, *U.S. asylum screeners to take more confrontational approach as Trump aims to turn more migrantsaway at the border*, Wash. Post (May 7, 2019), https://wapo.st/2JzaEe4;Geneva Sands et al., *White House Backs Stephen Miller Proposal to Let Border Patrol Agents to Conduct Asylum Interviews*, CNN (May 8, 2019, 1:27 PM), https://cnn.it/2ntS5AZ.

[22] *See, e.g.*, John Washington, *Bad Information: Border Patrol Arrest Reports Are Full of Lies That Can Sabotage Asylum Claims*, The Intercept (Aug. 11, 2019, 12:20 PM), https://bit.ly/2Kx6Zir; Amnesty International, *'You Don't Have Any Rights Here': Illegal Pushbacks, Arbitrary Detention & Ill-Treatment of Asylum-Seekers in the United*

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## FBI's History of Misconduct and Impunity

84. The FBI has had a long and problematic history with targeting and surveilling people of the Muslim faith. The United States House of Representatives Committee on the Judiciary recently held a hearing on Discrimination and the Civil Rights of the Muslim, Arab, and South Asian American Communities on Tuesday, March 01, 2022.[23]

85. The U.S. Supreme Court has ruled in *Tanvir v. Tanzin* that individuals can sue federal law-

86. enforcement officials for damages under the Religious Freedom Restoration Act of 1993 (RFRA). The Court was not persuaded by the FBI's argument that "state secret" investigations cannot be litigated without posing an unacceptable risk to national security.[24] Such a broad position would render virtually any FBI investigation as unable to be litigated in Court based solely on the FBI's blanket assertion that a matter concerns state secrets or poses a risk to national security.

87. Plaintiffs in the *Tanvir v. Tanzin* case sued the FBI after they were placed on the national "no fly list" in retaliation for their decision to not assist the FBI by becoming informants in the Muslim community. FBI had provided the plaintiffs with no reasoning as to why they were placed on the "no fly list," and there was no evidence to suggest that plaintiffs posed any security threat to the United States or to the public generally. After being approached by the FBI and given the

---

*States*, at 17. (2018), https://www.amnesty.org/en/latest/research/2018/10/usa-treatment-of-asylum-seekers-southern-border/; Shaw Drake et al., Human Rights First, *Crossing the Line: U.S. Border AgentsIllegally Reject Asylum Seekers* (May 2017), http://bit.ly/2pb69jd; U.S. Comm'n on Int'l Religious Freedom, *Barriers to Protection: The Treatment of Asylum Seekers in Expedited Removal* (2016), https://bit.ly/2uydMQ8.

[23] https://judiciary.house.gov/calendar/eventsingle.aspx?EventID=4857 (A YouTube video of the hearing is also available at that page).

[24] *See* Mansoor, S. Muslim Americans bring the fight against surveillance to the Supreme Court. Time. Retrieved February 28, 2022, from https://time.com/6097712/muslim-american-surveillance-supreme-court-sept-11/?utm_source=Pew+Research+Center&utm_campaign=bf14de7030-EMAIL_CAMPAIGN_2021_09_21_12_18&utm_medium=email&utm_term=0_3e953b9b70-bf14de7030-400753929

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

request to become informants, plaintiffs rejected the FBI's request and were subsequently put on the "no fly list" and prohibited from seeing their families overseas for years.[25]

88. The FBI maintains over 15,000 informants, and tens of thousands of unofficial informants. Recruiting Muslim informants has been an FBI priority as the agency seeks to expand its surveillance of the Muslim community.

89. Such recruitment of informants not only pertained to public spaces, but also to places of religious worship. The FBI actively worked and succeeded in recruiting Muslim informants to surveil mosques that the FBI was investigating.[26]

90. The FBI's further interaction with the Muslim community at airports in the United States and abroad demonstrates its targeted course of action pertaining to who it believes could be a threat to national security.

91. Research suggests that "the FBI's contact with Muslims is often not reliant upon actual indications of criminal activity, but instead the contact is predicated upon the suspicion of *who* is engaged in these behaviors. Under racialized state surveillance, these actions become hyper scrutinized and deemed worthy of FBI assessment."[27]

92. Such brazen attempts by the FBI to recruit informants is consistent with its past behavior in stopping and interrogating Muslim travelers at airports in the United States for questioning.

---

[25] *Tanvir v. Tanzin (formerly Tanvir v. Holder and Tanvir v. Lynch)*. Center for Constitutional Rights. (n.d.). Retrieved from https://ccrjustice.org/tanvir-v-tanzin

[26] Totenberg, N. (2021, November 8). *Supreme Court to hear arguments on FBI's surveillance of Mosques*. NPR. Retrieved from https://www.npr.org/2021/11/08/1052567444/supreme-court-to-hear-arguments-on-fbis-surveillance-of-mosques

[27] Alimahomed-Wilson, S. (n.d.). *When the FBI knocks: Racialized - rutgers center for ...* Retrieved from https://csrr.rutgers.edu/wp-content/uploads/2020/01/when-the-fbi-knocks.pdf

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## Role of Military in Pakistan

93. As Mr. Khan explained to Defendants (¶ 49), it is well-documented that the military in Pakistan exercises great leverage over all aspects of society, including politics and business.[28] Though other countries have begun to question excessive military budgets, Pakistan has as yet been unable to get out from under military involvement and control on businesses. This is due, in part, to a dismal economic recovery and a government that is ill-prepared to make changes.[29]

94. Top military brass tends to profit handsomely from the so-called Military-Business Complex (Milbus), which refers to the unstated entrepreneurial economic activity of the military for the profit of its members.[30] Pakistan's military is the country's wealthiest conglomerate with a net worth of 100 billion USD.[31] By taking over operations in various sectors of the economy, that would have otherwise been the task of private companies, the military has monopolized industries for its own economic benefit and restricted more legitimate civilian competitors.[32]

95. A 2007 article noted that Pakistan's military remained in firm control of businesses worth an estimated $40 billion -- about 10% of the economy. Corporate enterprises controlled by the Pakistani military ranged...from private security firms and bakeries, farms, schools, to insurance

---

[28] *See https://www.crossfirekm.org/articles/escaping-pakistans-pernicious-military-business-conglomerate-an-obstacle-to-sustained-growth.*

[29] *Id.*

[30] *Id. See also Siddiqa, Ayesha. Military Inc.: inside Pakistan's military economy. Penguin Random House India, 2017.*

[31] *Id.*

[32] *Id.*

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

companies, cement and cereal manufacturing plants.[33] Little has changed over the years.[34] A 2020 article reported that Pakistan's economy is still controlled by a ruthless business conglomerate – the army – that owns everything in the country, from factories and bakeries to farmland and golf courses.[35] In what remains a deeply compromised system, "powerful military leaders still hold the reins."[36]

96. Almost all public sector organizations in Pakistan are headed by retired military personnel with no corporate or business experience. While these companies employ civilians alongside soldiers, the final decision-making power rests in the hands these retired and few serving military generals turned millionaires.[37]

97. In Pakistan, there has always been and continues to be a hybrid coexistence of both democracy and authoritarianism. Even civilian regimes with popular support have not been all that democratic. As such, the tilt has arguably been predominantly in favor of military rule and the ISI in contemporary Pakistan. Given the economic and security pressures the country still faces, real reform in the years to come is unlikely, as is dispensing with the involvement of the military.[38]

98. It would be surprising if Mr. Khan, the marketing executive head of a multi-national corporation dealing with cell phones and computer sales all over the world, did not have contacts with military personnel of all levels in Pakistan within the context of his employment.

---

[33] https://www.business-humanrights.org/en/latest-news/pakistan-army-is-deep-into-business.

[34] *See, e.g., https://www.nytimes.com/2022/04/10/world/asia/pakistan-imran-khan-elections.html.*

[35] http://timesofindia.indiatimes.com/articleshow/79183808.cms.

[36] *See* FN 27.

[37] Wilson, E. (n.d.). *The military millionaires who control Pakistan Inc.*, Retrieved June 29, 2020, from https://www.spectator.co.uk/article/the-military-millionaires-who-control-pakistan-inc

[38] *See* Kunal Mukherjee, *The Military, ISI, and "Hybrid" Governments in Pakistan: From Independence to Musharraf,* https://www.tandfonline.com/doi/abs/10.1080/16161262.2017.1309172

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

99. ISI has acquired a larger-than-life image among all the institutions in Pakistan, with over 25,000 permanent employees and reportedly 30,000 on its rolls as informants and other related roles; the ISI is a well- organized and well-oiled outfit.[39]

100.    As is the case with military personnel of all levels, it would be surprising if Mr. Khan, the marketing executive head of a multi-national corporation dealing with cell phones and computer sales all over the world, did not have contacts with employees or even informants (unknow to Khan) for ISI in Pakistan within the context of his employment.

101.    Defendants relied upon false accusations (express and implied) for the sole purpose of harming Mr. Khan and violating his rights.  Mr. Khan does know some individuals who may be active or former military servicemen, but he has known them either on a personal level, through social circles, or while working as an executive for his former employers as an executive in the cell phone sales industry. He has never had any dealings with any of them in an official or intelligence related capacity.

102.    Defendants' questions regarding Mr. Khan's ties to either the military or the ISI suggest that they were not only attempting to acquire information for false reports, but were also engaging in illegal racial profiling against a Muslim without any verified information, corroborating evidence or any other legitimate reason. Had there been any truth or legitimacy to any of their claims, they would either present that present that evidence to the court OR they would not have allowed Mr. Khan to enter the US literally less than a week before this incident.

### **Harm Suffered by Mr. Khan**

---

[39] Kamal Davar (2017), *Trust With Perfidy: The Deep State of Pakistan*, New Delhi: Rupa Publications Pvt. Ltd, p. 68. *See also* Jyoti M. Pathania, *ISI in Pakistan's Domestic Politics: An Assessment,* CLAWS Journal, Winter 2020.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

103.     As a direct and proximate result of the conduct of Defendants, Mr. Khan suffered substantial harm, including loss of liberty, invasion of privacy, substantial emotional distress, loss of reputation, and physical harm. He has also suffered substantial economic damage, including the costs of issuing FOIA requests and attempting to clear his record of false reports, cost of litigation, and attorney fees.

104.     Mr. Khan, who has been already waiting for ten years to have his immigration visa approved, has now been informed that he can no longer be eligible for the visa waiver program, which enables him to visit family, including his aging parents. He fears that, as a result of Defendants' conduct on January 3, 2021 and the false reports created and transmitted related to the events occurring on that date, he will never be able to immigrate to the United States with his wife and children to reunite with his parents and the rest of the family.

105.     Gary Hale, a national security expert witness, provided a statement in reference to the entire matter, including the harm that the Defendants have caused and will continue to cause with their actions against Mr. Khan, Mr. Malik, and their families. *See* sealed EXHIBIT 1. Several officers and other Government employees were intentionally dishonest and lied under oath in their depositions to mislead the court. These depositions are also being submitted to the court as sealed exhibits. *See* Sealed EXHIBIT 2.  Due to the nature of the content and at the previous desire of the Defendants, these exhibits will be filed as a sealed exhibit. If the Defendants do not agree with the sealing of these documents, the Plaintiffs have no objection to have them filed as public exhibits. Since then, the Mr. Malik, has been continually been targeted, harassed, violated, and physically attacked with the intent of retribution for bringing this matter into judicial review and the audacity

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

to stand up against the all might United States Government. *See* detailed declaration as EXHIBIT 3[40].

## A.    Plaintiff's FOIA Requests and Defendants' Failure to Respond

106. By separate letters or email or fax to each of the Defendants, except for CBP which was submitted through an online portal, Plaintiff(s) submitted FOIA requests for documents, records, data, and information pertaining to Plaintiff Khan and the January 3, 2021, incident which made the basis of the requests. All of the requests have produced either no results, partial results, or otherwise have been arbitrarily responded to.

## B.    CBP, USCIS, ICE and FBI have violated FOIA

107. Plaintiff(s) has received either no production of information or an arbitrary response from either or all Defendants. In addition, the lawfully required Vaughn index fully describing the search methods employed and individually describing the lawful basis for each exemption on each page of information has not been produced to Plaintiff(s) as mandated by FOIA by any of the Defendants. *See Vaughn v. Rosen*, 484 F.2d 820 (D.C.Cir. 1973), *on remand to*, 383 F.Supp. 1049 (D.D.C. 1974), *judgment aff'd*, 523 F.2d 1136 (D.C.Cir. 1975)(The government must provide detailed justification of its exemption claims, and it must specifically itemize and index each document or portion thereof so as to show which were disclosable and which were exempt); *Batton v. Evers*, 598 F.3d 169, 173 (5th Cir.2010)("the district court abused its discretion by failing to order a *Vaughn* index").

108. Defendant's refusal to search for and produce the requested nonexempt agency information in its possession is not attributable to Plaintiff.

---

[40] Due to the timing of the event, Plaintiffs in that matter never had the opportunity to file this declaration with the court in the Northern District of Texas.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

109. Plaintiff(s) has been irreparably harmed because of Defendant's unlawful failure to produce the information requested under the Freedom of Information Act, because without the requested information, the undersigned counsel will be unable to effectively represent his client; and Plaintiff Khan will not receive either procedural due process or effective assistance of counsel as guaranteed by the Fifth and Sixth Amendments respectively. *Accardi v. Shaughnessy*, 347 U.S. 260 (1954)(A government agency's failure to follow its own regulations that are promulgated to protect fundamental statutory or constitutional rights violates due process and no showing of prejudice or harmful error is required); *Bridges v. Wilson*, 326 U.S. 135 (1945); *Zadvydas v. Davis*, 533 U.S. 678, 693 (2011)("[T]he Due Process Clause applies to all 'persons' within the United States, including aliens, whether their presence here is lawful, unlawful, temporary, or permanent"); *Padilla v. Kentucky*, 559 U.S. 356 (2010)(Aliens present in the United States are afforded the right to effective assistance of counsel under the Sixth Amendment to the U.S. Constitution); *Reno v. Flores*, 507 U.S. 292, 306 (1993)("It is well established that the Fifth Amendment entitles aliens to due process of law in deportation proceedings."); *see also Plyler v. Doe*, 457 U.S. 202 (1982); *Wong Yang Sung v. McGrath*, 339 U.S. 33 (1950); *Hernandez v. Cremer*, 913 F.2d 230 (5th Cir. 1990); *Chike v. INS*, 948 F.2d 961 (5th Cir. 1991).

**C.   Defendant CBP's Failure to Timely Comply with Plaintiff's Five Requests**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

| Original Request | Request Number | Date of Appeal | Appeal Number |
|---|---|---|---|
| 03/26/21 | CBP-2021-046570 | 04/28/21 05/25/21 | CBP-AP-2021-058001 CBP-AP-2021-067254 |
| 07/19/21 | CBP-2021-085549 | 05/25/21 | CBP-AP-2021-067254 |
| 01/06/22 | CBP-2022-030369 | 05/10/22 04/28/22 05/12/22 | By USPS mail CBP-2022-071905 CBP-AP-2022-077708 |
| 04/28/22 | CBP-2022-071874 | 04/28/22 | CBP-AP-2022-076446 |
| 04/28/22 | CBP-2022-071905 | 04/28/22 | CBP-AP-2022-076462 |

110. Plaintiff(s) submitted five separate FOIA request to Defendant CBP on various dates pertaining to Plaintiff Khan and/or the Jan 03, 2021, incident at the DFW airport.

111. Plaintiff(s) specific requests and all correspondences are included in EXHIBIT A.

112. CBP provided little or no responsive documents for some requests. On others, CBP either provided an arbitrary response or no reasoning as to the denial of the requested records were ever provided to Plaintiff.

113. Plaintiff(s) appealed CBP's denial or non-responsiveness on the dates mentioned in the chart above.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

114. On some appeals CBP provided no decision regarding Plaintiff's appeals, and on others an arbitrary decision has been provided.

115. Defendants CBP has failed to provide the required Vaughn index to the Plaintiff(s).

116. Plaintiff(s) has exhausted the applicable administrative remedies with respect to its FOIA request to CBP.

117. CBP has wrongfully withheld the requested records from Plaintiff.

**D.  Defendant USCIS's Failure to Timely Comply with Plaintiff's Request**

118. Plaintiff(s) submitted a FOIA request to Defendant USCIS on or around June 1, 2021.

119. Plaintiff's FOIA request to USCIS asked for copies of records pertaining to Plaintiff Khan's name found in anything within USCIS's jurisdiction and control. Plaintiff(s) further requested immigration file, and all records pertaining to Plaintiff Khan held by USCIS.

120. In a letter dated July 8, 2021, USCIS indicated that they received Plaintiff's FOIA request on or around June 1, 2021.

121. On or about August 10, 2021, USCIS released partial documents responsive to the Plaintiff's request, to which the Plaintiff(s) filed a timely appeal.

122. On August 26, 2021, the USCIS acknowledged the appeal and released a few additional documents but not all documents. Additionally, the USCIS failed to produce the Vaughn index.

123. Plaintiff(s) has exhausted the applicable administrative remedies with respect to its FOIA request to USCIS.

124. USCIS has wrongfully withheld the requested records from Plaintiff.

125. Plaintiff(s) specific requests and all correspondences are included in EXHIBIT B.

**E.  Defendant FBI's Failure to Timely Comply with Plaintiff's Request**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

126. Plaintiff(s) submitted a FOIA request to Defendant FBI on May 26, 2021, via fax and USPS mail.

127. Plaintiff's FOIA request to FBI asked for copies of records pertaining to Plaintiff Khan's name found in anything within FBI's jurisdiction and control. Plaintiff(s) further requested FBI for all records pertaining to Plaintiff Khan held by FBI.

128. In a letter dated June 7, 2021, the FBI acknowledged receipt of Plaintiff's FOIA request and indicated that the request produced no records.

129. On August 3, 2021, Plaintiff(s) appealed the FOIA request, no documents being produced, and the arbitrary response by the FBI, indicating a request number 1497995-000.

130. The FBI acknowledged the appeal in a letter dated August 19, 2021, and assigned an appeal number A-2021-02568.

131. The FBI once again responded to the appeal in a letter dated October 08, 2021, stating that there were no records that were responsive to the FOIA request.

132. Plaintiff(s) has exhausted the applicable administrative remedies with respect to its FOIA request to the FBI.

133. The FBI has wrongfully withheld the requested records from Plaintiff.

134. Plaintiff(s) specific requests and all correspondences are included in EXHIBIT C.

**F.    Defendant ICE's Failure to Timely Comply with Plaintiff's Request**

135. Plaintiff(s) submitted a FOIA request to Defendant ICE on May 28, 2022, via email and the web form as directed by the ICE's website.

136. Plaintiff's FOIA request to ICE asked for copies of records pertaining to Plaintiff Khan's name found in anything within ICE's jurisdiction and control. Plaintiff(s) further requested ICE for all records pertaining to Plaintiff Khan held by ICE.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

137. Defendant ICE rejected and routed the FOIA to CBP, albeit incorrectly, outlined in an email dated May 31, 2022. Defendant ICE did not provide with a method for appealing the FOIA.

138. On May 31, 2022, Plaintiff(s) emailed ICE to file an appeal for the incorrect rejection and routing of the FOIA to CBP.

139. Plaintiff(s) has exhausted the applicable administrative remedies with respect to its FOIA request to the ICE.

140. ICE has wrongfully withheld the requested records from Plaintiff.

141. Plaintiff(s) specific requests and all correspondences are included in EXHIBIT D.

## IX. CLAIMS FOR RELIEF

### FIRST CAUSE OF ACTION
### DECLARATORY JUDGEMENT ACT

142. Plaintiff(s) incorporates by reference all previous paragraphs as if fully set forth herein.

143. Plaintiff(s) contends that Defendants' actions violate 5 U.S.C. § 552(a)(6)(A) and 6 C.F.R. § 5.6(c).

### SECOND CAUSE OF ACTION
### INJUNCTIVE RELIEF

144. Plaintiff(s) incorporates by reference all previous paragraphs as if fully set forth herein.

145. Plaintiff(s) contends that Defendant should be required to expedite Plaintiff's FOIA request and make the requested documentation, records, data, files, information, etc. available to Plaintiff(s) forthwith.

### THIRD CAUSE OF ACTION
### VIOLATION OF THE FOIA – IMPROPER WITHHOLDING OF AGENCY RECORDS

146. Plaintiff(s) incorporates by reference all previous paragraphs as if fully set forth herein.

COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

147. Plaintiff(s) has a legal right under the FOIA to obtain agency records described in his FOIA requests.

148. No legal basis exists for Defendants' failure to adequately search for and promptly disclose responsive agency records in accordance with requirements set forth in the FOIA.

149. Defendants' failure to make reasonable efforts to search for responsive agency records, and its wrongful withholding of agency records sought in connection with Plaintiff's FOIA requests, violates the FOIA.

150. Defendants' wrongful withholding of the agency records sought in connection with Plaintiff's requests violates the FOIA.

151. Plaintiff(s) is being irreparably harmed by reason of Defendant's unlawful withholding of the requested agency information; and Plaintiff(s) will continue to be irreparably harmed unless Defendants are compelled to conform their conduct to the requirements of FOIA.

152. Plaintiff(s) has exhausted all of his administrative remedies.

### FOURTH CAUSE OF ACTION
### VIOLATION OF THE FOIA – FAILURE TO MAKE A DETERMINATION AND PROMPTLY PRODUCE RESPONSIVE DOCUMENTS

153. Plaintiff(s) incorporates by reference all previous paragraphs as if fully set forth herein.

154. Defendants are obligated under 5 U.S.C. § 552(a)(6)(A)(i) to make a determination on Plaintiffs' FOIA Request within twenty business days. In unusual circumstances, Defendant may invoke an extension no longer than ten days. 5 U.S.C. § 552(a)(6)(B)(i).

155. Defendants have failed to make a determination within thirty days, the maximum amount of time permitted under the statute.

156. Defendants are obligated to produce responsive records promptly under 5 U.S.C. § 552(a)(3)(A)(i).

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

157. Defendants have failed to promptly produce responsive records.

158. Defendants' failure to make a determination within the statutory time frame and produce responsive records promptly violates 5 U.S.C. §§ 552(a)(3)(A), (a)(6)(A)(i), and (a)(6)(B)(i).

159. Defendants exceeded the legal response time of twenty days in 5 U.S.C. §552(a)(6)(A)(i) and failed to provide written notice if a ten-day extension was needed in the "unusual circumstances" set forth in 5 U.S.C. § 552(a)(6)(B) and 6 C.F.R. § 5.6(c).

## FIFTH CAUSE OF ACTION
## VIOLATION OF THE FOIA – FAILURE TO CONDUCT AN ADEQUATE SEARCH FOR RESPONSIVE RECORDS

160. Plaintiff(s) incorporates by reference all previous paragraphs as if fully set forth herein.

161. Defendants have custody and control over the records Plaintiff(s) seeks through his FOIA request.

162. Defendants bear the burden of proving beyond material doubt that it performed an adequate search for responsive records.

163. Defendants are obligated under 5 U.S.C. § 552(a)(3) to conduct a reasonable search for records responsive to Plaintiff's FOIA requests. Defendants failed to conduct such a search.

164. Defendants possess the records Plaintiff(s) seeks and Plaintiff(s) has a legal right to obtain such records. No legal basis exists for Defendants' failure to search for them.

165. Defendants' failure to conduct a reasonable search for records responsive to Plaintiff's requests violates 5 U.S.C. § 552(a)(3).

## SIXTH CAUSE OF ACTION
## VIOLATION OF THE FOIA – FAILURE TO EXPEDITE

166. Plaintiff(s) incorporates by reference all previous paragraphs as if fully set forth herein.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

167. Plaintiff(s) sought expedited treatment of his FOIA request pursuant to 5 U.S.C. § 552(a)(6)(E).

168. Defendant denied Plaintiffs' request for expedited processing on February 16, 2022.

169. Defendant wrongfully denied Plaintiff's request for expedited processing of Plaintiff's FOIA request.

170. Defendant has failed to provide records as soon as practicable for Plaintiffs' request.

171. Defendant's failure to provide records as soon as practicable for Plaintiff's request for expedited processing violates 5 U.S.C. § 552(a)(6)(E)(iii).

## SEVENTH CAUSE OF ACTION
## VIOLATION OF THE FOIA – REQUEST FOR ATTORNEY FEES

172. Plaintiff(s) incorporates by reference all previous paragraphs as if fully set forth herein.

173. Plaintiff(s) contends that Defendants should be required to pay for Plaintiff's attorney fees and related cost in accordance with the FOIA for all violations under the FOIA, for having to bring this suit and any related matters.

174.  Plaintiff(s) seeks an award of its attorney's fees, costs and expenses under FOIA, 5 U.S.C. § 552(a)(4)(E). *See Gahagan v. U.S. Citizenship and Immigration Services*, 2016 WL 1110229 (E.D.La.2016)(Brown, J.); *Gahagan v. United States Customs and Border Protection*, 2016 WL 3090216 (E.D.La.2016)(Brown, J.); *Hernandez v. U.S. Customs and Border Protection Agency*, 2012 WL 398328 (E.D.La. 2012)(Barbier, J.).

## EIGHTH CAUSE OF ACTION
## VIOLATION OF THE APA – ARBITRARY AND CAPRICIOUS

175. Plaintiff(s) incorporates by reference all previous paragraphs as if fully set forth herein.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

176. Defendants' action in withholding the requested information was arbitrary and capricious under 5 U.S.C. §551 *et seq.*, 5 U.S.C.§ 555(b),   §702, §704 and   §706, the Administrative Procedure Act.

177. Defendants have willfully and unreasonably delayed and refused to provide Plaintiff(s) with the information requested under FOIA in a timely manner, despite a showing of "exceptional need or urgency".

## NINTH CAUSE OF ACTION
## VIOLATION OF THE APA – EQUAL ACCESS TO JUSTICE ACT

178.  Plaintiff(s) incorporates by reference all previous paragraphs as if fully set forth herein.

179.  The Defendants' delay is without justification and has forced the Plaintiff(s) to resort to this Court for relief, and the Plaintiff(s) is entitled to attorney's fees pursuant to the Equal Access to Justice Act ("EAJA"), 28 U.S.C. § 2412(d)(2).

180. Plaintiff(s) will seek attorney's fees and costs under the Equal Access to Justice Act (EAJA), as amended, 5 U.S.C. § 504 and 28 U.S.C. § 2412.

## TENTH CAUSE OF ACTION
## VIOLATION OF THE FOIA – PATTERN AND PRACTICE OF FAILING TO TIMELY ADJUDICATE FOIA PROCESSING REQUESTS

181.  Plaintiff(s) incorporates by reference all previous paragraphs as if fully set forth herein.

182.  Since receiving Plaintiff's FOIA requests, the Defendants has failed to adjudicate it, in violation of the FOIA. This has been done multiple times and with various agencies of the DHS and the FBI, therefore creating a pattern.

183.  Defendant's failure to properly and lawfully handle Plaintiff's multiple requests for adjudicating and properly processing is part of a pattern and practice by Defendant's FOIA office.

184.  Plaintiff(s) has personal and ongoing interest, and a legal right under the FOIA, in being

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

able to make FOIA requests through the expedited processing provisions of the Act.

185.   Defendant's chronic failure to timely respond to FOIA processing requests like those from requestors violates the letter and purpose of the Act by depriving FOIA requestors of timely information allowing them to determine what their government is up to in real time.

186.   Plaintiff(s) has constructively exhausted his administrative remedies with respect to expedited processing.

**ELEVENTH CAUSE OF ACTION**
**APPOINTMENT OF SPECIAL MASTER**

187.   Plaintiff(s) incorporates by reference all previous paragraphs as if fully set forth herein..

188.   Should the Court rule that a search may be made of the responsive records being held by the Defendants, this Court, pursuant to Fed. R. Civ. P. 53, and its inherent powers, has the authority to order that the search and review of all the records, including information and documents that may be claimed by the Defendants to be related to an "exception" under the FOIA and/or related to "national security," be conducted by a Special Master or neutral third-party subject matter expert and under the supervision of this Court or a Magistrate Judge pursuant to protocols reviewed by the parties and approved by this Court or a Magistrate Judge.

189.   The protocols should permit Plaintiff(s) to have a duplicate copy of the list of documents and information to be searched prior to any search, permit Plaintiff(s) to contest any findings by a Special Master or third-party subject matter expert that a particular matter is not covered under an exception and/or national security by *in camera* review of this Court or a Magistrate Judge and prohibit Defendants from withholding any such documents and information until first approved by this Court or a Magistrate Judge.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

190.   Defendants should be required to bear the entire cost of the Special Master or third-party subject matter expert.

## X.    REQUEST FOR RELIEF

**WHEREFORE**, Plaintiff(s) prays that this Court:

A.  Assume jurisdiction over this matter;

B.  Find and Declare that Defendants violated 5 U.S.C. §§ 552(a)(6)(A) and (B), 552(a)(3)(A), and 6 C.F.R. §§ 5.5(c) and 5.6(c) by failing to provide a timely response to Plaintiff's FOIA requests;

C.  Find and Declare that Defendants violated 5 U.S.C. § 552(a)(6)(B) and 6 C.F.R. § 5.6(b) by failing to provide adequate notice within twenty (20) days of the "unusual circumstances" that prevented Defendants from processing Plaintiff's FOIA requests in a timely fashion;

D.  Find and Declare that Defendants violated 5 U.S.C. § 552(a)(6)(B) by failing to provide the date on which a determination is expected to be dispatched;

E.  Find and Declare that Defendants' failure to conduct an adequate search violates 5 U.S.C. § 552(a)(3);

F.  Find and Declare that Defendant's failure to process the Plaintiffs' FOIA request as soon as practicable violates 5 U.S.C. § 552(a)(6)(E);

G.  Find and Declare that Defendant's failure to process the Plaintiffs' FOIA request as soon as practicable violates 5 U.S.C. § 552(a)(6)(E);

H.  Order Defendants to conduct an adequate and comprehensive search, within all records that the agency has possession or access to, for records responsive to the FOIA requests filed by Plaintiff(s) under 5 U.S.C. § 552(a)(3);

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

I.  Order all Defendants to conduct a legally adequate search for all requested information in Plaintiff's FOIA request, segregate all nonexempt information responsive to Plaintiff's FOIA request, produce forthwith all nonexempt information responsive to Plaintiff's FOIA request, and produce a *Vaughn* index of all responsive information withheld under claim of exemption;

J.  Enjoin all Defendants from continuing to withhold any nonexempt agency information responsive to Plaintiff's FOIA request;

K.  Order Defendants to produce all records responsive to Plaintiff's FOIA requests as soon as practicable in accordance with its grant of expedited treatment under 5 U.S.C. § 552(a)(6)(E)(iii), within 30 days, or alternatively on an expedited schedule established by the Court;

L.  Order Defendants to disclose the requested records in their entirety and make copies available to Plaintiff;

M.  Preliminarily and permanently enjoin and restrain Defendants and any of their agents or other persons, departments, or components acting for, with, by, through, or under them from withholding the agency records at issue in this case, or frivolously claiming exemptions under FOIA;

N.  Find and Declare that Defendants' denial of Plaintiff's request for expedited processing violated the Freedom of Information Act in that Plaintiff(s) demonstrated that substantial due process rights would be impaired by the failure to process immediately and thus established an "exceptional need or urgency";

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

O.  Should the Court determine that any documents or information should be produced appoint a Special Master and determine the appropriate protocols as articulated in the Eleventh cause of action;

P.  Order the Defendants to pay for all costs related to the Eleventh cause of action;

Q.  Find and Declare that the agency action in this case was "arbitrary and capricious" thus violating the Administrative Procedure Act;

R.  Provide for expeditious proceedings in this action;

S.  Order Defendants that If any document or information that is not accounted for or otherwise produced in and through this action, then they are enjoined from being used against plaintiff Khan in any government proceeding, administrative proceeding, judicial proceedings, or otherwise be used in any way, or to support an immigration benefits denial or otherwise to cause harm to Plaintiff Khan.

T.  Award Plaintiffs reasonable attorneys' fees and other litigation costs pursuant to 5 U.S.C. § 552(a)(4)(E) and any other applicable statute or regulation; and

U.  Grant such other relief as the Court may deem just, equitable, and appropriate.

**RESPECTFULLY SUBMITTED,**

**MALIK & ASSOCIATES, PLLC.**

Respectfully submitted on <u>August 19, 2022</u>.
<u>/s/ Adam Malik</u>
Adam Malik
Attorney-In-Charge
Texas Bar Number: 24094151
DC Bar Number:  TX0200

Malik & Associates, PLLC
P.O. Box 110251
Carrollton, TX 75011

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

(214) 881-2100 Tel
(469) 262-5800 Fax
amalik@malikfirm.com Email

**ATTORNEY FOR PLAINTIFF**

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## VERIFICATION

I, Fraz Malik Khan, am a Plaintiff named in this action. I state under penalty of perjury that I have read the contents of this Original Verified Complaint for the Declaratory Judgment, Injunctive, and other Relief, and the exhibits submitted in support thereof, and I certify under penalty of perjury, for myself that the statements and claims made are true and correct of my knowledge, except as to those statements made on information and belief, and as to those, I believe them to be true.

_____
Fraz Malik Khan

12 - 08 - 2022
Date

SUBSCRIBED AND SWORN to before me this 12 day of August 2022.

ATTESTED
Maqsood Ahmed Advocate
Notary Public
High Court Lahore

_____
Notary Public