UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| FRAZ KHAN, et al.,<br><br>      Plaintiffs,<br><br>      v.<br><br>U.S. DEP'T OF HOMELAND SECURITY, et al.<br><br>      Defendants. | Civil Action No. 22-2480 (TJK) |

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND SUPPORTING MEMORANDUM

Defendants U.S. Customs and Border Protection ("CBP"), U.S. Citizenship and Immigration Services ("USCIS"), the Federal Bureau of Investigation ("FBI"), United States Immigration and Customs Enforcement ("ICE"), and the U.S. Department of Homeland Security ("DHS") respectfully move pursuant to Federal Rules of Civil Procedure ("Rule") 56 for summary judgment in this action under the Freedom of Information Act ("FOIA").[1]

## BACKGROUND

As addressed more fully below, this action concerns FOIA requests submitted by a law firm, Malik and Associates PLC, for records on behalf of an individual named Fraz Khan (the brother of Adam Malik, a principal in the Malik firm). Some of the requests sought records relating to Mr. Khan generally, while others pertain to a specific incident that occurred in January 2021 when Mr. Khan presented himself for inspection by CBP at a U.S. port of entry (Dallas-Fort Worth

---

[1]    Plaintiffs have brought suit solely claiming a violation of the provisions of FOIA. 2d Am. Compl. (ECF No. 24) ¶¶ 1, 86-125. Accordingly, this motion is limited to addressing Plaintiffs' claims under FOIA, which are the only claims before the Court.

International Airport) on January 3, 2021. As identified in the Second Amended Complaint ("2d. Am. Compl."), and addressed more fully below, the requests at issue consist of the following: CBP-2021-046570, CBP-2022-030369, CBP-2022-071874 (collectively, "CBP requests"); USCIS request NRC2021098456 (the "USCIS request"); ICE request 2022-ICFO-18821 ("ICE request"); and FBI request number 1497995 ("FBI request") (collectively, "FOIA requests"). 2d. Am. Compl. (ECF No. 24) ¶¶ 51-85.[2] Plaintiffs are the Malik law firm and Mr. Khan.

## I.    **The CBP Requests**

The requests to CBP were submitted by Adam Malik of the Malk law firm on March 26, 2021 (request no. 46570), January 6, 2022 (request no. 30369), and April 28, 2022 (request no. 71874). 2d Am. Compl. ¶ 53; *supra* n.1. The requests sought information regarding Fraz Khan. Requests (ECF No. 24-1) at ECF pp. 1-3, 20, 32-33.

On May 5, 2021, CBP notified the requestor of a final disposition of the March 26, 2021 request, assigned number CBP-2021-046570, specifically, that records were partially releasable. Declaration of Shari Suzuki ("Suzuki Decl.") ¶ 12. CBP released seven pages of records in total, of which two pages were released in full and five pages were withheld in part based on FOIA Exemptions 6, 7(C), and 7(E). *Id.* Following an administrative appeal, CBP conducted a supplemental search that identified an additional 108 pages of potentially responsive records making the total number identified from its searches 115 pages. *Id.* ¶¶ 13-19. Of those pages, two pages were referred to ICE for direct response to the Plaintiff. ICE provided a direct response to

---

[2]    The Court already ruled that Plaintiffs cannot base a claim on CBP-2021-085549. Mem. Op. (ECF No. 16) at 19. Thus, insofar as the Second Amended Complaint references that request (2d. Am. Compl. ¶ 53), any claim about that request already has been resolved in the government's favor. Further, insofar as the inclusion of CBP-2022-071905 in the table in Second Amended Complaint ¶ 53 seeks to bring allegations regarding that request, the Court previously ordered any such claims dismissed. Mem. Op. (ECF No. 16) at 19. Accordingly, any claim based on that request, having been resolved in favor of the government, also is not addressed herein.

Plaintiff on April 18, 2022, consisting of those two pages with redactions under Exemption 6, 7(C) and 7(E) of FOIA. Declaration of Fernando Pineiro ("Pineiro Decl.") ¶ 11.

Of the 106 pages from the supplemental search processed by CBP, CBP produced in full 19 pages, withheld in full 22 pages based on Exemptions 5, 6, 7(C), 7(E), and 7(F), and produced in part 65 pages with redactions under Exemptions 3, 5, 6, 7(C), and 7(E). Suzuki Decl. ¶ 19. The accompanying declaration of Christian Esteves of the Transportation Security Administration ("TSA") ("Esteves Decl.") explains the basis for CBP's redactions of Sensitive Security Information under Exemption 3 of FOIA.

On January 20, 2022, CBP acknowledged receipt of CBP-2022-030369, which was submitted on January 6, 2022. That request sought a lengthy list of records related to Mr. Khan. Request (ECF No. 24-1) at ECF pp. 20-21. While that request was pending, Plaintiff filed an administrative "appeal" that CBP denied as premature by letter dated May 12, 2022. Declaration of Patrick Howard ("Howard Decl.") ¶ 13. Ultimately, CBP's search identified 79 pages of potentially responsive records to this request. *Id.* By letter dated July 26, 2022, CBP issued its final response, which released those pages with withholdings based on Exemptions 6, 7(C) and 7(E). *Id.* & Ex. B. CBP's final response letter also declined to confirm or deny the existence of certain types of information under Exemption 7(E). *Id.* Plaintiff did not file an administrative appeal of this final response. *Id.*

Finally, while CBP was processing CBP-2022-030369, Plaintiff submitted a FOIA request dated April 28, 2022, that requested all records "connected to" Mr. Khan. Request (ECF No. 24-1) at ECF p. 35. CBP assigned that request number CBP-2022-071874 and, on May 1, 2022, CBP notified the requester that the April 28, 2022 request was being closed because it was a duplicate of CBP-2022-030369. Suzuki Decl. ¶ 8; *see also* Letter (ECF No. 24-1) at ECF p. 37. An appeal

of that determination was submitted on May 10, 2022, and an appeal determination issued on May 16, 2022, advising the requester to either submit a new request or wait for a determination for CBP-2022-030369.  Suzuki Decl. ¶ 9-10; Letter (ECF No. 24-1) at ECF p. 85.

## II.     The USCIS Request

The request to USCIS was dated May 19, 2021, and received by USCIS on June 1, 2021. Declaration of James Baxley ("Baxley Decl.") ¶ 6.  The request sought a "copy of entire file (physical and electronic).  All data and information related to Franz Malik Khan."  USCIS assigned FOIA tracking number NRC2021098456 to the request and by letter dated June 8, 2021, acknowledged receipt of the request.  *Id.* ¶ 7.  USCIS issued its response on July 8, 2021.  Letter (ECF No. 24-1) at 155-157.  In its response letter, USCIS explained that it had identified fifty-five pages responsive to the request, and that thirteen pages were being released in their entirety, twenty-seven pages were being released in part, and fifteen pages were being withheld in full.  The letter stated that the information withheld was based on Exemptions 6, 7(C) and 7(E).

Following an administrative appeal, a determination was made to provide the requester with additional information from sixteen pages and to otherwise uphold the processing of records by the FOIA office.  Baxley Decl. ¶ 10; Letter (ECF No. 24-1) at ECF p. 140-41.  Specifically, fifteen pages that initially had been withheld in full were released in part.  Additionally, one page that initially had been withheld in part was released with fewer redactions.  Baxley Decl. ¶ 10. After the complaint was filed, USCIS determined that additional information could be released regarding a third party named in the records if that third party consented to the release of his information to Plaintiff Khan.  That third party completed and submitted the necessary consent form, and USCIS lifted redactions on sixteen pages that had been previously released in part which resulted in the pages being released in full.  In addition, USCIS lifted one additional redaction on a page released in part.  These pages were provided by letter dated November 20, 2024.  *Id.*

¶¶ 11-12.  Ultimately, USCIS released twenty-nine pages in full and twenty-six pages in part.  The records released in part originated from CBP and, on behalf of CBP, USCIS withheld in part information from those twenty-six pages under Exemption 7(C) and 7(E) of FOIA.  *Id.* ¶¶16-17.

### III.    The FBI Request

The request to the FBI was submitted by the Malik law firm on or about May 26, 2021 and on behalf of Mr. Khan.  Declaration of Michael G. Seidel ("Seidel Decl.") ¶ 5.  The request sought "copies or any documents, records, information, and files, kept/maintained/possessed/whether digital or physical pertaining to myself[,] including but not limited to FBI Number JMFC7HLN1." *Id.*  By letter dated June 7, 2021, the FBI acknowledged receipt of the request and advised that it was not able to locate any records in response to the request.  *Id.* ¶ 6.  The FBI's response letter included the FBI's standard *Glomar* position as to certain types of records, and further advised that the inclusion of the standard addendum is not an indication that records do or do not exist.  *Id.* ¶ 26 & Addendum to Ex. B.  Following an appeal, an October 8, 2021, decision of the Department of Justice Office of Information Policy upheld the FBI's determination.  *Id.* ¶ 9.

### IV.    The ICE Request

A FOIA request was submitted to ICE on May 28, 2022, seeking "any and all documents, records, data, information, or item related to Subject Fraz Malik Khan (DOB [redacted]), including but not limited to during his contact, apprehension, detention by the CBP at the DFW airport on or around Jan 04, 2021."  2d. Am. Compl. (ECF No. 24) ¶ 79; *see also id.* (ECF No. 24-1) at ECF p. 208.  On June 7, 2022, ICE acknowledged receipt of the request and assigned it request number 2022-ICFO-18821.  Letter (ECF No. 24-1) at ECF p. 211.  By letter dated August 15, 2022, and sent by email on August 17, 2022, ICE provided a final response to that request, advising that no responsive records were found and providing a notice of administrative appeal rights.  Decl. of Fernando Pineiro ("Pineiro Decl.") ¶ 10 and Ex. 1.  No administrative appeal was submitted.  *Id.*

Instead, the instant lawsuit was filed on August 19, 2022. Thereafter, without waiver of its position that Plaintiffs failed to administratively exhaust this request, ICE conducted a supplemental search that located three pages of documents which it released to Plaintiffs with redactions on November 17, 2022. *Id*. ¶¶ 12-14.

ICE notes that, in contrast to the section of the Second Amended Complaint identifying "[t]he FOIA Requests" at issue, which identifies the request at issue as being made on May 28, 2022 (*i.e.*, the request assigned number 2022-ICFO-18821), the section addressed to the "Claims for Relief" references a different request to ICE from 2021 assigned number 2021-ICFO-40195. *Compare* 2d Am. Compl. (ECF No. 24) ¶ 79 with *id*. ¶ 96.[3] Because the Second Amended Complaint specifically identifies the FOIA request at issue as the request submitted on May 28, 2022, which is the request assigned 2022-ICFO-18821, that is the only request to ICE that can form the basis for any claim against ICE asserted in this action. 2d. Am. Comp. (ECF No. 24) ¶ 79; id. (ECF No. 24-1) at ECF p. 211.

For reasons set forth below, summary judgment should be granted in favor of Defendants.

## LEGAL STANDARDS

Summary judgment is appropriate when the pleadings and evidence "show[] that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Tao v. Freeh*, 27 F.3d 635, 638 (D.C. Cir. 1994). The

---

[3]      The 2021 request was narrower than the May 28, 2022 request, as the 2021 request sought "all information pertaining to detentions and the seizure of Fraz Malik Khan's electronic cellular device at DFW airport, date range January 3, 2021 to January 4, 2021." 2d Am. Compl. (ECF No. 24-1) at ECF p. 193. Because CBP is the component of the Department of Homeland Security that conducts inspections of passengers arriving at ports of entry, ICE notified Plaintiffs by email dated May 31, 2022, that the request had been routed to CBP as the DHS component likely to maintain responsive records. *Id.* at ECF p. 204. That request, as routed to CBP, is not identified as any of the CBP requests at issue in this lawsuit. 2d Am. Compl. (ECF No. 24) ¶ 53; *supra* n.1.

party seeking summary judgment must demonstrate the absence of a genuine issue of material fact.

*See Celotex*, 477 U.S. at 248.  A genuine issue of material fact is one that "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248.  Once the moving party has met its burden, the nonmoving party "may not rest upon the mere allegations or denials of his pleading, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 248.

The "vast majority" of FOIA cases are decided on motions for summary judgment.  *See Brayton v. Office of U.S. Trade Rep.*, 641 F.3d 521, 527 (D.C. Cir. 2011); *Media Rsch. Ctr. v. Dep't of Just.*, 818 F. Supp. 2d 131, 136 (D.D.C. 2011) ("FOIA cases typically and appropriately are decided on motions for summary judgment."); *Citizens for Resp. & Ethics in Wash. ("CREW") v. Dep't of Lab.*, 478 F. Supp. 2d 77, 80 (D.D.C. 2007).  An agency may be entitled to summary judgment in a FOIA case if it demonstrates that no material facts are in dispute, it has conducted an adequate search for responsive records and each responsive record that it has located either has been produced to the plaintiff or is exempt from disclosure.  *See Weisberg v. Dep't of Just.*, 627 F.2d 365, 368 (D.C. Cir. 1980).

To meet its burden, a defendant may rely on reasonably detailed and non-conclusory declarations.  *See McGehee v. CIA*, 697 F.2d 1095, 1102 (D.C. Cir. 1983); *Vaughn v. Rosen*, 484 F.2d 820 (D.C. Cir. 1973); *Media Rsch. Ctr.*, 818 F. Supp. 2d at 137.  "[T]he Court may award summary judgment solely on the basis of information provided by the department or agency in declarations when the declarations describe 'the documents and the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith.'"  *CREW*, 478 F. Supp. 2d at 80 (quoting *Military Audit Project v.*

*Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981)).  "[A]n agency's justification for invoking a FOIA exemption is sufficient if it appears 'logical' or 'plausible.'"  *Media Rsch. Ctr.*, 818 F. Supp. 2d at 137 (quoting *Larson v. Dep't of State*, 565 F.3d 857, 862 (D.C. Cir. 2009)).

## ARGUMENT

FOIA requires that an agency release all agency records responsive to a properly submitted request unless such records are protected from disclosure by one or more of the Act's nine exemptions.  5 U.S.C. § 552(b); *Dep't of Just. v. Tax Analysts*, 492 U.S. 136, 150-51 (1989).  Once the court determines that an agency has released all non-exempt material, it has no further judicial function to perform under FOIA, and the FOIA claim is moot.  *Perry v. Block*, 684 F.2d 121, 125 (D.C. Cir. 1982); *Muhammad v. Customs & Border Prot.*, 559 F. Supp. 2d 5, 7-8 (D.D.C. 2008).

## I.    Plaintiffs Failed To Exhaust Administrative Remedies As To CBP-2022-030369 and The ICE Request

"The statutory scheme in the FOIA specifically provides for an administrative appeal process following an agency's denial of a FOIA request," and "courts have consistently confirmed that the FOIA requires exhaustion of this appeal process before an individual may seek relief in the courts."  *Oglesby v. Dep't of Army*, 920 F.2d 57, 61-62 (D.C. Cir. 1990) (citing 5 U.S.C. §§ 552(a)(6)(A)(i), (ii) and cases).  Although exhaustion under FOIA is not jurisdictional, it nonetheless is an important "'jurisprudential doctrine'" that must be enforced, because the requester's failure to exhaust precludes judicial review "if a merits determination would undermine the purpose of permitting an agency to review its determinations in the first instance."  *Bloomgarden v. Dep't of Just.*, 10 F. Supp. 3d 146, 151 (D.D.C. 2014).

Exhaustion is a "condition precedent" to filing a lawsuit, and the failure to exhaust "precludes judicial review."  *Hidalgo v. FBI*, 344 F.3d 1256, 1259 (D.C. Cir. 2003); *Bonner v. Soc. Sec. Admin.*, 574 F. Supp. 2d 136, 138-39 (D.D.C. 2008) (observing that administrative

exhaustion is a "condition precedent" to filing suit and dismissing a prematurely filed lawsuit). Here, CBP provided a final response to request CBP-2022-030369 by letter dated July 26, 2022, and Plaintiffs did not file an administrative appeal of that response prior to filing suit on August 19, 2022. Howard Decl. ¶ 13 and Ex. A. Accordingly, Plaintiffs failed to exhaust administrative remedies as to that request. Likewise, ICE responded to request number 2022-ICFO-18821 by letter dated August 15, 2022, which was sent by email on August 17, 2022. Pineiro Decl. ¶ 10. *See Bloomgarden v. Dep't of Just.*, 10 F. Supp. 3d 146, 152 (D.D.C. 2014) (stating that "the central question at issue here is not the date on which the defendant mailed the letter, but rather the date on which plaintiff received it"). Accordingly, Plaintiffs have failed to exhaust administrative remedies as to CBP request 2022-030369 and ICE request 2022-ICFO-18821, and summary judgment should be granted to CBP and ICE as to any claims based on those requests for this threshold reason.

## II.    **Defendants Conducted Adequate Searches**

Under the FOIA, an agency must undertake a search that is "reasonably calculated to uncover all relevant documents." *Weisberg v. Dep't of Just.*, 705 F.2d 1344, 1351 (D.C. Cir. 1983); *see Oglesby v. Dep't of Army*, 920 F.2d 57, 68 (D.C. Cir. 1990) ("[T]he agency must show that it made a good faith effort to conduct a search for the requested records, using methods which can be reasonably expected to produce the information requested."). A search is not inadequate merely because it failed to "uncover[] every document extant." *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1201 (D.C. Cir. 1991); *see Judicial Watch v. Rossotti*, 285 F. Supp. 2d 17, 26 (D.D.C. 2003) (noting that "[p]erfection is not the standard by which the reasonableness of a FOIA search is measured"). Rather, a search is inadequate only if the agency fails to "show, with reasonable detail, that the search method . . . was reasonably calculated to uncover all relevant documents." *Oglesby*, 920 F.2d at 68. An agency, moreover, is not required to examine "virtually every

document in its files" to locate responsive records. *Steinberg v. Dep't of Just.*, 23 F.3d 548, 552 (D.C. Cir. 1994); *see also Hall v. Dep't of Just.*, 63 F. Supp. 2d 14, 17-18 (D.D.C. 1999) (finding that agency need not search for records concerning subject's husband even though such records may have also included references to subject). Rather, as here, it is appropriate for an agency to search for responsive records in accordance with the manner in which its records are maintained. *Greenberg v. Dep't of Treasury*, 10 F. Supp. 2d 3, 13 (D.D.C. 1998).

Once an agency demonstrates the adequacy of its search, the agency's position can be rebutted "only by showing that the agency's search was not made in good faith." *Maynard v. CIA*, 986 F.2d 547, 560 (1st Cir. 1993). Hypothetical assertions are insufficient to raise a material question of fact with respect to the adequacy of an agency's search. *Oglesby*, 920 F.2d at 67 n.13. "Agency affidavits enjoy a presumption of good faith that withstands purely speculative claims about the existence and discoverability of other documents." *Chamberlain v. Dep't of Just.*, 957 F. Supp. 292, 294 (D.D.C. 1997).

A.    **CBP Conducted a Reasonable Search**

1.    CBP Conducted a Reasonable Search for Acknowledged Records

CBP conducted an adequate search for request numbers CBP-2021-046570 and CBP-2022-030369. Because the third request at issue, CBP-2022-071874, was duplicative of CBP-2022-030369, and was submitted while the earlier request was pending, CBP properly closed the latter request, as it already was undertaking a search for records responsive to a pending request seeking materially similar information.

Request CBP-2021-046570 was submitted on March 26, 2021 by the Malik law firm, seeking information regarding Mr. Khan in connection with the inspection that occurred on or about January 3, 2021 at DFW Airport, as well as "[a]ll emails pertaining" to Mr. Khan since December 2020 and "all information pertaining" to Mr. Khan since January 2013. Suzuki Decl.

¶ 11.  As an initial matter, and as the D.C. Circuit recently held, "[a]gencies have the discretion to construe requests reasonably." *Kowal v. Dep't of Just.*, 107 F.4th 1018, 1028 (D.C. Cir. 2024).  A reasonable interpretation includes reviewing the language of the request but also applying the agency's knowledge of how records are maintained within the agency to construe what the request is seeking.  *Id.*  For instance, agencies "do not need to honor unreasonably burdensome requests, boiling the ocean in search of responsive records," and thus, between an interpretation that would result in undue burden and one that would not, agencies have "discretion" to choose the latter.  *See id.* at 1028-29; *Frost Brown Todd LLC v. Ctrs. for Medicare and Medicaid Servs.*, Civ. A. No. 21-2784 (TSC), 2024 U.S. Dist. LEXIS 19303, at *8-9 (D.D.C. Feb. 5, 2024) (a request seeking "all records" related to a topic is not reasonably descriptive).  Accordingly, a request seeking "all records" within an agency about an individual—like this request to CBP—may be construed reasonably to focus on locations where the agency reasonably expects records to be located based on information provided in the request, which in this instance references an inspection that occurred at DFW Airport in January 2021.  *Kowal*, 107 F.4th at 1027-28 ("The framing of Kowal's requests directed the agencies toward their criminal investigation databases.")

In response to CBP-2021-046570, an initial search was conducted of the Analytical Framework for Intelligence by using Plaintiff Fraz Khan's name and date of birth and the e3 data portal, which collects biographic and biometric information about individuals encountered at the border and checkpoints, which search identified seven pages of responsive records.  Suzuki Decl. ¶¶ 12, 23.  Thereafter, supplemental searches were conducted at DFW Airport, within the Office of Field Operations, the Office of Information Technology and the Office of Chief Counsel.  *Id.* ¶ 17.  That included searches of the TECS, which is a system that includes border crossing information, as well as another search of the e3 data portal.  *Id.* ¶ 23.  The timeframe of those

searches dated back to January 1, 2013. *Id*. ¶ 25. Staff at DFW Airport searched email files and port files containing records regarding detained property, and the Office of Information Technology searched the individual CBP email account that the requester had specifically identified in his administrative appeal of CBP's initial response to the request. *Id*. ¶¶ 28-29. Those searches collectively identified an additional 108 pages. *Id*. ¶ 18.

CBP-2022-030369 was submitted on January 6, 2022, and sought records related to Plaintiff Fraz Khan regarding his interactions with CBP at DFW Airport on or about January 3, 2021 (item 1), as well as a laundry list of other specific documents relating to Mr. Khan (items 2 to 24). Accordingly, that request encompassed to a large extent records that already would have been the focus of CBP's search in connection with CBP-2021-046570. Nevertheless, CBP conducted a search of its Analytical Framework for Intelligence using Mr. Khan's name and date of birth, and also conducted a further search of records maintained by staff at DFW Airport. Howard Decl. ¶¶ 9-10. The Analytical Framework for Intelligence is a system that draws information from TECS which, as already noted, includes, among other things, information for all individuals who enter or are admitted into and (when available) exit from the United States. *Id*. ¶¶ 17-18. Staff at DFW Airport, moreover, searched the Unified Passenger system and the inspecting officer's Microsoft OneDrive, Desktop and Outlook for documents potentially responsive to Plaintiff's FOIA request. *Id*. ¶ 21. These searches identified 79 pages of records. *Id*. ¶ 13. Thus, reasonably construing the request, *Kowal*, 107 F.4th at 1028, CBP conducted an adequate search in response to CBP-2022-030369, particularly when considered in conjunction with the search that was conducted for CBP-2021-046570, which was a broader request.

2.  CBP Has Properly Asserted a *Glomar* Response to Neither Confirm Nor Deny
    The Existence of Unacknowledged Records

CBP's July 26, 2022 final response letter regarding Request CBP-2022-030369 advised the requester of CBP's standard position that it can neither confirm nor deny the existence of certain types of information that implicate FOIA exemptions, including Exemption 7(E). Howard Decl. ¶ 13. In lieu of searching for and withholding exempt records, "an agency may issue a *Glomar* response, *i.e.*, refuse to confirm or deny the existence or nonexistence of responsive records if the particular FOIA exemption at issue would itself preclude the acknowledgement of such documents." *Elec. Priv. Info. Ctr. v. NSA ("EPIC")*, 678 F.3d 926, 931 (D.C. Cir. 2012). "Because *Glomar* responses are an exception to the general rule that agencies must acknowledge the existence of information responsive to a FOIA request and provide specific, non-conclusory justifications for withholding that information, they are permitted only when confirming or denying the existence of records would itself 'cause harm cognizable under an FOIA exception.'" *Roth v. Dep't of Just.*, 642 F.3d 1161, 1178 (D.C. Cir.2011) (quoting *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007)). "In determining whether the existence of agency records vel non fits a FOIA exemption, courts apply the general exemption review standards established in non-*Glomar* cases." *Wolf*, 473 F.3d at 374. "An agency waives any right to make a *Glomar* response by disclosing whether responsive records exist." *Knight First Amend. Inst. v. CIA*, 11 F.4th 810, 815 (D.C. Cir. 2021).

Here, CBP has invoked a *Glomar* response based on Exemption 7(E), because confirming or denying the existence of certain types of responsive records would disclose techniques and procedures, or guidelines for law enforcement investigations or prosecutions, the disclosure of which would risk circumvention of the law. Howard Decl. ¶ 13; 5 U.S.C. § 552(b)(7)(E). Exemption 7(E) has been applied by courts to uphold a *Glomar* response. *See, e.g., Braun v. FBI*,

Civ. Act. No. 18-2145 (CRC), 2019 U.S. Dist. LEXIS 124107, at *13-14 (D.D.C. July 25, 2019). Because CBP cannot further explain the basis for the *Glomar* response in a public filing without undermining Exemption 7(E), concurrent with this motion CBP is moving for leave to file an *ex parte*, *in camera* declaration to further support that response.  Howard Decl. ¶ 13; *see Montgomery v. IRS*, 40 F.4th 702, 713-14 (D.C. Cir. 2022) (recognizing that in camera declarations are permissible "'when (1) the validity of the government's assertion of exemption cannot be evaluated without information beyond that contained in the public affidavits and in the records themselves, and (2) public disclosure of that information would compromise the secrecy asserted.'").

### B.    USCIS Conducted a Reasonable Search

The Malik law firm's request to USCIS sought a "[c]opy of entire file (physical and electronic).  All data and information related to Fraz Malik Khan."  Baxley Decl. ¶ 6.  The cover letter to the request, and the request itself, included Mr. Khan's A-Number.  Letter (ECF No. 24-1) at ECF p. 142; Request (ECF No. 24-1) at ECF p. 148.  The request also included Mr. Khan's petition receipt number.  Request (ECF No. 24-1) at p. 148.  USCIS reasonably construed the request as seeking documents related to Mr. Khan, including any physical and electronic file. Baxley Decl. ¶ 7.  USCIS is the official custodian of an individual's A-File, which is the official record of an individual's immigration history.  *Id*. ¶ 14.  A-Files are shared with CBP, which contributes documents to those files.  *Id.*  A-Files are maintained under and retrievable by reference to an individual's name and A-Number, along with the date of birth, or some combination of that information.  *Id.*  A receipt number is a thirteen-character identifier that USCIS provides for each application or petition it receives to identify and track cases.  *Id.*

In response to the request, USCIS, through its National Records Center, ran a computerized data search in the Department of Homeland Security's file tracking system, RAILS, using information about Mr. Khan provided in the request.  *Id*. ¶ 15.  Through this search, the National

Records Center located both the A-File and a petition receipt number file associated with Mr. Khan. *Id.* Accordingly, USCIS's search was reasonable. *Kowal*, 107 F.4th at 1029 ("Given the parameters of [plaintiff's] request and because the agencies located [the subject's] criminal investigation files, [the search] was reasonable.")

C.    **ICE Conducted a Reasonable Search**

The request to ICE that is at issue in this action was submitted on May 28, 2022, and sought "any and all documents, records, data, information, or item related to Subject Fraz Malik Khan (DOB [redacted]), included but not limited to during his contact, apprehension, detention by the CBP at the DFW airport on or around Jan 04, 2021." 2d. Am. Compl. (ECF No. 24) ¶ 79; *see also id*. (ECF No. 24-1) at ECF p. 208. ICE is the principal investigative arm of the Department of Homeland Security and, when a requester seeks information about a specific person, ICE searches the records of the two offices, its Office of Homeland Security Investigations, and Enforcement and Removal Operations, that interact with individuals in the course of immigration law enforcement actions. Pineiro Decl. ¶ 25. ICE searched the Investigative Case Management System utilized by the Office of Homeland Security Investigations using Mr. Khan's name. *Id*. ¶ 28. That search did not locate any responsive records. *Id.* Enforcement and Removal Operations searched the Central Index System database using Mr. Khan's name, date of birth and country of birth and, after an alien number was located from that search, also searched the Enforce Alien Removal Module database using that alien number. *Id*. ¶ 31. That search identified three pages of records, which consisted of a printout from the Enforce Alien Removal Module database. *Id.* As ICE searched all locations reasonably likely to yield responsive records, ICE's search was reasonable.

D.     **FBI Conducted a Reasonable Search**

1.   The FBI Conducted a Reasonable Search for Acknowledged Records

The Seidel Declaration demonstrates that the FBI's search was reasonably calculated to uncover all relevant documents. The FBI request sought documents pertaining to Mr. Khan with a date range of January 2012 until the date the search was executed.  Seidel Decl. ¶ 5 and Ex. A. The request also made reference to "FBI Number JMFC7HLNl."  *Id.*

The FBI determined that, in light of the subject of the FOIA request, the records sought were most likely to be indexed in the Bureau's comprehensive Central Records System, which compiles records that include "investigative, intelligence," and "personnel" files created in the course of the FBI's law enforcement and intelligence missions. *Id.* ¶ 12. FBI personnel are required by agency policy to store their federal records in the agency's central recordkeeping system.  *Id.* at 6 n. 5.  Accordingly, the FBI's decision to search the agency's expansive Central Records System was reasonable, as that is the only location likely to contain responsive documents.

FBI personnel access the general indices to the Central Record System through Sentinel, the FBI's case management system since July 1, 2012, and its prior case management system known as Automated Case Support.  *Id.* ¶ 17.  In response to the request, the FBI searched the Central Records System using both Sentinel indices and Automated Case Support indices, using various iterations of Mr. Khan's name.  *Id.* ¶¶ 20-21.  Thus, all records in the Central Records System that contained an index entry (e.g., name of person, organization, activity, or event) matching Plaintiff's was reasonably likely to be identified through the FBI's search methodology. The FBI did not locate any responsive records using Mr. Khan's name.  *Id.* ¶ 21.  The FBI conducted a supplemental search using the FBI number provided in the FOIA request and did not locate any responsive records using that number.  *Id.*  The Court should therefore find that the FBI

conducted a reasonable and adequate search to locate all potentially responsive documents and enter summary judgment in favor of the FBI.

2. <u>The FBI Properly Asserted a *Glomar* Response to Neither Confirm Nor Deny the Existence of Unacknowledged Records.</u>

The FBI included with its June 7, 2021, no-records response letter an Addendum that asserted the FBI's standard position to neither confirm nor deny the existence of unacknowledged records within the following categories: national security or foreign intelligence records, which are withheld under Exemptions 1 and 3, in conjunction with 50 U.S.C. § 3024(i)(1); records that would identify individuals in the Witness Security Program, pursuant to FOIA Exemption 3 and 18 U.S.C. § 3521; records that would identify individuals on a watchlist, pursuant to FOIA Exemption 7(E); and records, the release of which could reasonably be expected to endanger the life or physical safety of a confidential human source, pursuant to FOIA Exemptions 7(D), 7(E), and 7(F).  Seidel Decl. ¶¶ 23-26 and Ex. B (June 7, 2021 letter and accompanying Addendum); *see also* Second Declaration of Michael G. Seidel (attached as Ex. F to the Seidel Decl.) ¶¶ 1-34. This standard *Glomar* response is proper for reasons set forth below.  *See Wilson v. FBI*, No. 22-3062 (ABJ), 2025 U.S. Dist. LEXIS 28560, at *16-27 (D.D.C. Feb. 18, 2025) (upholding a similarly-asserted standard *Glomar* response by the FBI).  As discussed below, with respect to each category of unacknowledged records, the FBI's *Glomar* response is appropriate and should be upheld by the Court.

a. *National Security or Intelligence Records*

"[W]hen a *Glomar* response touches upon issues of national security—'a uniquely executive purview'—courts must give agency decisions substantial deference." *Competitive Enter. Inst. v. NSA*, 78 F. Supp. 3d 45, 53 (D.D.C. 2015) (quoting *EPIC*, 678 F.3d at 931).  Courts in this District "consistently defer[ ] to executive affidavits predicting harm to national security, and have

found it unwise to undertake searching judicial review." *Ctr. for Nat'l Sec. Studies v. Dep't of Just.*, 331 F.3d 918, 927 (D.C. Cir. 2003). If the agency's *Glomar* response appears "logical" and "plausible," the Court should sustain the agency's *Glomar* assertion. *ACLU v. Dep't of Def.*, 628 F.3d 612, 624 (D.C. Cir. 2011).

FOIA Exemption 1 permits agencies to withhold information specifically protected from disclosure by an executive order in the interest of national security. 5 U.S.C. § 552(b)(1); *see Larson v. Dep't of State*, 565 F.3d 857, 861 (D.C. Cir. 2009). Exemption 3 allows non-disclosure of information specifically protected from disclosure by statute, either because the statute provides no discretion regarding disclosure of the information, or because the statute sets specific criteria that are shown to be satisfied by the information at issue. 5 U.S.C. § 552(b)(3); *Reporters Comm. for Freedom of the Press v. Dep't of Just.*, 816 F.2d 730, 734 (D.C. Cir.), *modified on other grounds*, 831 F.2d 1124 (D.C. Cir. 1987), *rev'd on other grounds*, 489 U.S. 749 (1989).

Relying on Exemptions 1, 3, and the National Security Act, 50 U.S.C. § 3024(i)(1), the Bureau issued a *Glomar* response covering records that—if their existence or non-existence were acknowledged—could harm United States national security or the FBI's efforts to gather foreign intelligence. 2d Seidel Decl. (Ex. F to Seidel Decl.) ¶ 8. While the FBI does not acknowledge the existence or non-existence of such records, this category of records may include "national security investigative files pertaining to . . . terrorism or counterintelligence," records of "surveillance targeting acknowledged subjects of national security interest," "non-public documents pertaining to national security related intelligence programs or events," and "intelligence community (IC) assessments concerning threats to the national security of the United States." *Id.* The disclosure of the existence or non-existence of national security or intelligence information "would provide adversaries with valuable insight into the [Bureau's investigative efforts," "permit hostile

governments to appraise the scope, focus, location[,] and capabilities of the [Bureau's] intelligence-gathering methods and activities," "allow hostile agents to devise countermeasures to circumvent" the Bureau's methods and activities, and allow hostile actors to "assess[] the ability of [the Bureau] to obtain information on a specific target during a specific period of time," thus damaging the Bureau's national security and intelligence mission. *Id.* ¶ 19.

To the extent Plaintiff's FOIA request reaches such records, the FBI's *Glomar* response finds unequivocal support in FOIA Exemptions 1, 3, and the National Security Act, 50 U.S.C. § 3024(i)(1). *See, e.g.*, *Schaerr v. Dep't of Just.*, 435 F. Supp. 3d 99, 113 (D.D.C. 2020) (accepting agency components' *Glomar* responses relying on Exemptions 1 and 3). The Bureau is bound to comply with Executive Order 13526, which exempts from public disclosure classified records of intelligence activities, sources, and methods. *See* 2d Seidel Decl. (Ex. F to Seidel Decl.) ¶¶ 11–16. Further, the National Security Act mandates the protection of intelligence sources and methods, whether or not such information is classified; such information is therefore properly withheld pursuant to the non-discretionary prong of Exemption 3. *See* 50 U.S.C. § 3024(i)(1); 2d Seidel Decl. (Ex. F to Seidel Decl.) ¶¶ 17–19. Accordingly, as explained in the Second Seidel Declaration, the FBI has appropriately asserted a *Glomar* response over unacknowledged records pertaining to national security and intelligence.

### b. Witness Security Program

The FBI also asserted a *Glomar* response over unacknowledged records that could identify individuals in the Witness Security Program, relying on FOIA Exemption 3 and 18 U.S.C. § 3521(b)(1)(G). 2d Seidel Decl. (Ex. F to Seidel Decl.) ¶¶ 20–22. That statutory provision, and regulations promulgated thereunder, prohibit the Bureau from disclosing "any information concerning the Witness Security Program or its participants." *Id.* ¶ 20 (citing 18 U.S.C.

§ 3521(b)(1)(G), 28 C.F.R. 0.111(b)(B), and Attorney General Order No. 2511-2001). "To publicly address the existence of Witness Protection Program information in the context of a particular request would indicate the presence of [such] information in responsive records, thus revealing information that is statutorily prohibited from being disclosed." *Id.* ¶ 21.

The FBI therefore asserts this standard *Glomar* response whenever a FOIA requester seeks information about an individual, in order for its assertions to remain credible and effective, *id.*, and to further the government's interest in protecting information that would identify confidential witnesses, *see CIA v. Sims*, 471 U.S. 159, 172 (1985); *Barnes v. FBI*, 35 F.4th 828, 830–31 (D.C. Cir. 2022). The Court should therefore leave undisturbed the FBI's *Glomar* response with respect to unacknowledged documents that could reveal individuals in the Witness Security Program.

### c.  *Records that Would Identify Individuals on a Watchlist*

The FBI consistently "neither confirms nor denies the existence of watchlist records" in response to a FOIA request for records pertaining to an individual, as is the case in this matter. *See* 2d Seidel Decl. (Ex. F to Seidel Decl.) ¶ 23. "The [Bureau's] records concerning terrorist watchlists were compiled and created in furtherance of the FBI's law enforcement and national security functions." *Id.* ¶ 24. The information compiled in such lists "is used to enable the [Bureau]" to perform its core law enforcement and national security-related duties." *Id.* Therefore, watchlist records meet FOIA Exemption 7's threshold requirements. *See Rhodes v. FBI*, 316 F. Supp. 3d 173, 177 (D.D.C. 2018) (finding that the threshold law enforcement of Exemption 7 was "without question satisfied" with respect to the Bureau's records concerning watchlists).

Furthermore, revealing the existence or non-existence of individuals on terrorist watchlists "would disclose the techniques and procedures for law enforcement investigations" and "risk circumvention of the law." 5 U.S.C. 552(b)(7)(E). For example, an individual who "knows who is

or is not on a watchlist" can deduce the behavior that may land a person on such a list. 2d Seidel Decl. ¶ 25. "This knowledge would allow criminals to develop countermeasures to conceal their activities and thwart [the Bureau's] efforts to combat crime and protect" national security. *Id*. Revealing that a person is on a watchlist "would induce the individual to flee, hide[,] or destroy evidence"; on the other hand, disclosing that a person is not on a watchlist "could embolden a criminal to continue [their] activities and encourage other criminals" to follow suit. *Id.* Either outcome would diminish the FBI's ability to effectively deploy watchlists to meet its law enforcement and national security mandate. *See id.*

Because the disclosure of the existence or non-existence of watchlists records would harm an interest protected under FOIA Exemption 7(E), the Court should enter summary judgment in favor of Defendant in connection with its assertion of *Glomar* over records that would identify individuals on a watchlist.

### d.   *Records that Could Endanger Confidential Sources*

The FBI consistently relies on Exemptions 7(D), 7(E), and 7(F) in neither confirming nor denying the existence of records concerning confidential sources or the FBI's confidential human source program. 2d Seidel Decl. (Ex. F to Seidel Decl.) ¶ 27. Exemption 7(D) "protects . . . information that could reasonably be expected to disclose the identity of a confidential source." *Shem-Tov v. Dep't of Just.*, 531 F. Supp. 3d 102, 107 (D.D.C. 2021); 5 U.S.C. § 552(b)(7)(D). As discussed below, Exemption 7(E) exempts from disclosures law enforcement techniques and procedures.   Finally, Exemption 7(F) protects records or information compiled for law enforcement purposes "the production of [which] . . . could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F); *see Elec. Priv. Info. Ctr. v. Dep't of Homeland Sec.*, 777 F.3d 518, 525 (D.C. Cir. 2015) (FOIA does not require an agency

"to identify the specific individuals at risk from disclosure," thus by its own express terms, Exemption 7(F) is to be construed broadly).

As the Second Seidel Declaration explains, disclosure of the existence or non-existence of confidential source information implicates the interests protected by Exemptions 7(D), 7(E), and 7(F). Taken in order: first, disclosure of the existence or non-existence of confidential source information in response to a particular FOIA request "would create a pattern" of information from which "criminals could easily discern who is and is not a [Bureau confidential source]." Second Seidel Decl. (Ex. F to Seidel Decl.) ¶ 29. Second, revealing the existence or non-existence of records about confidential sources "could reveal non-public investigative strategies and the scope of intelligence available to the [Bureau]," and could allow bad actors to identify confidential sources, thus limiting the Bureau's ability to rely on this law enforcement technique while exposing confidential sources to potential reprisal. *Id.* ¶ 31. And third, the agency's "[e]xperience has shown that when identifying information concerning a [confidential source] becomes known, that disclosure places the [confidential source] in a particularly vulnerable position and subjects the [confidential source] to violent retaliation through physical harm or even death." *Id.* ¶ 33.

For these reasons, the Court should uphold the FBI's reliance on Exemptions 7(D), 7(E), and 7(F) in issuing a standard *Glomar* response pertaining to records that could endanger the life or physical safety of confidential sources.

### III.    CBP and ICE Properly Applied FOIA Exemptions

CBP and ICE applied one or more of the following FOIA exemptions as addressed more fully below: Exemption 3, 5, 6, 7(C), 7(E), and 7(F). For its part, of the fifty-five pages processed by USCIS, USCIS released twenty-nine pages in full, and the remaining twenty-six pages were released in part based on Exemptions 7(C) and 7(E). Baxley Decl. ¶ 16. Because the redactions on those pages contain information that originated with CBP, the basis for the application of those

redactions is addressed in the discussion below regarding CBP's application of Exemption 7(C) and 7(E).  *Id.* ¶ 17.

### A.    CBP Properly Applied Exemption 3

CBP sent twelve pages to TSA for consultation that CBP had deemed responsive to request number CBP-2021-046570.  Esteves Decl. ¶ 6.  TSA determined that limited information on three of those twelves pages—specifically on the "TECS Person Query" records—encompassed information that could be used to determine an individual's status on a watch list utilized by TSA for passenger pre-board screening.  Esteves Decl. ¶¶ 6, 12.  Such information constitutes Sensitive Security Information ("SSI") under 49 C.F.R. § 1520.5(b)(9)(ii) and thus was redacted by CBP under Exemption 3 based on consultation with TSA.  *Id.* ¶¶ 12-13; *see also* Suzuki Decl. ¶ 33.

Exemption 3 permits an agency to withhold documents exempted from disclosure by a statute other than FOIA, "provided that such statute (A) requires that the matter be withheld from the public in such a manner as to leave no discretion on the issue, or (B) established particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). Under 49 U.S.C. § 114(r), the Administrator of TSA is directed by Congress to prescribe regulations prohibiting the disclosure of any information (notwithstanding FOIA) that would "(A) be an unwarranted invasion of personal privacy; (B) reveal a trade secret or privileged or confidential or financial information; or (C) be detrimental to the security of transportation." Courts have held that this provision is a "statute of Exemption as contemplated by Exemption 3." *Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*, 928 F. Supp. 2d 139, 145–46 (D.D.C. 2013); *see also Skurow v. Dep't of Homeland Sec.*, 892 F. Supp. 2d 319, 329 n.7 (D.D.C. 2012); *Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*, 384 F. Supp. 2d 100, 110 n.10 (D.D.C. 2005).

TSA has enacted regulations as directed by § 114(r) at 49 C.F.R. part 1520. The regulations label information covered by § 114(r) as SSI and define specific categories of information falling under that label. The authority to determine what specific information or documents falls within the SSI regulations has been delegated to TSA's Chief of Sensitive Security Information, who oversees TSA's SSI Program.  Esteves Decl. ¶ 2.

Importantly, federal district courts are without jurisdiction to review TSA's determination of what information must be withheld from disclosure as SSI because Congress has made such review exclusive to the federal courts of appeals. 49 U.S.C. § 46110(a) ("[A] person disclosing a substantial interest in an order issued . . . in whole or in part under . . . subsection . . . (s) of section 114 [since redesigned as subsection (r)] may apply for review of the order by filing a petition for review in the United States Court of Appeals for the District of Columbia Circuit or in the court of appeals of the United States for the circuit in which the person resides or has its principal place of business."). Courts of appeals thus have exclusive jurisdiction to "affirm, amend, modify or set aside" the final orders issued by TSA referenced in § 46110(a), including SSI designations made pursuant to § 114(r). 49 U.S.C. § 46110(c); *see also MacLean v. Dep't of Homeland Sec.*, 543 F.3d 1145, 1149 (9th Cir. 2008) (holding that section 46110 governs review of decision to designate a document SSI); *Koutny v. Martin*, 530 F. Supp. 2d 84, 91 (D.D.C. 2007) ("A remedy to challenge a final TSA classification order [of SSI] is provided by statute. An interested party may petition to modify or set aside such an order in an appropriate court of appeals.").  Accordingly, to the extent that TSA has determined that information constitutes SSI, this Court is without jurisdiction to review the determinations underlying the withholding of that information on that basis. *See Elec. Privacy Info Ctr.*, 928 F. Supp. 2d at 147 ("Because this Court lacks jurisdiction to review the

merits of the specific withholdings made pursuant to [§ 114(r)], the legal conclusion that § 114(r)

qualifies for exemption 3 withholding takes this Court as far as it can go here.") (citation omitted).

But even were this Court to conclude that it has jurisdiction to review TSA's designation

of the redacted information on the three pages as SSI, that review would still be quite limited.

"When analyzing whether the defendant is entitled to invoke Exemption 3, the court need not

examine the detailed factual contents of specific documents withheld; rather, the sole issue for

decision is the existence of a relevant statute and the inclusion of withheld material within the

statute's coverage." *James Madison Project v. CIA*, 607 F. Supp. 2d 109, 126 (D.D.C. 2009). Upon

its review, TSA determined that the release of the redacted information on the three pages at issue

could be detrimental to transportation security, and therefore CBP properly withheld that redacted

information under Exemption 3.  Suzuki Decl. ¶ 33.

### B.    CBP Properly Applied Exemption 5

Exemption 5 protects "inter-agency or intra-agency memorandums or letters which would

not be available by law to a party other than an agency in litigation with the agency."  5 U.S.C.

§ 552(b)(5).  This exemption shields documents of the type that would be privileged in the civil

discovery context, including materials protected by the deliberative process privilege and attorney

client privilege.  *Nat'l Lab. Rels. Bd. v. Sears, Roebuck & Co.*, 421 U.S. 132, 149 (1975); *see Jud.

Watch, Inc. v. Dep't of Just.*, 365 F.3d 1108, 1113 (D.C. Cir. 2004); *Rockwell Int'l Corp. v. Dep't

of Just.*, 235 F.3d 598, 601 (D.C. Cir. 2001).

The deliberative process privilege is designed to prevent injury to the quality of agency

decisions by (1) encouraging open, frank discussions on matters of policy between subordinates

and superiors; (2) protecting against premature disclosure of proposed policies before they are

adopted; and (3) protecting against public confusion that might result from the disclosure of

reasons and rationales that were not in fact ultimately the grounds for an agency's decision.  *See Sears*, 421 U.S. at 151-53; *Coastal States Gas Corp. v. Dep't of Energy*, 617 F.2d 854, 866 (D.C. Cir. 1980); *CREW v. Dep't of Homeland Sec.*, 648 F. Supp. 2d 152, 156 (D.D.C. 2009); *FPL Grp. v. IRS*, 698 F. Supp. 2d 66, 81 (D.D.C. 2010).

To invoke the deliberative process privilege, an agency must show that the exempt document is both pre-decisional and deliberative.  *Access Reports v. Dep't of Just.*, 926 F.2d 1192, 1194 (D.C. Cir. 1991); *Coastal States*, 617 F.2d at 868; *Tax Analysts v. IRS*, 117 F.3d 607, 616 (D.C. Cir. 1997).  For a document to be pre-decisional, it must be antecedent to the adoption of an agency policy.  *See Jordan v. Dep't of Just.*, 591 F.2d 753, 774 (D.C. Cir. 1978) (en banc); *see also In re Sealed Case*, 121 F.3d 729, 737 (D.C.Cir.1997) ("The deliberative process privilege does not shield documents that simply state or explain a decision the government has already made[.]").  To show that a document is pre-decisional, however, the agency need not identify a specific final agency decision; it is sufficient to establish "'what deliberative process is involved, and the role played by the documents at issue in the course of that process.'"  *Heggestad v. Dep't of Just.*, 182 F. Supp. 2d 1, 7 (D.D.C. 2000) (quoting *Coastal States*, 617 F.2d at 868); *see Gold Anti-Tr. Action Comm. v. Bd. of Governors*, 762 F. Supp. 2d 123, 135-36 (D.D.C. 2011) ("even if an internal discussion does not lead to adoption of a specific government policy, its protection under Exemption 5 is not foreclosed as long as the document was generated as part of a definable decision-making process.").

Thus, a document is "'predecisional' if it precedes, in temporal sequence, the 'decision' to which it relates.'"  *Abtew v. Dep't of Homeland Sec.*, 808 F.3d 895, 898 (D.C. Cir. 2015). Exemption 5, however, is not dependent on whether a final decision ultimately resulted from the employee's deliberations.  Were it otherwise, the purpose of the exemption would be defeated

because "[a]t the time of writing the author could not know whether the decisionmaking process would lead to a clear decision, establishing the privilege, or fizzle, defeating it." *Access Reports*, 926 F.2d at 1196. The focus of Exemption 5 instead is whether the document was part of the decisionmaking process. *Id.*; *see also Nat'l Sec. Archive v. CIA*, 752 F.3d 460, 463 (D.C. Cir. 2014) ("The term 'deliberative' in this context means, in essence, that the communication is intended to facilitate or assist development of the agency's final position on the relevant issue."); *Huntington v. Dep't of Com.*, 234 F. Supp. 3d 94, 110 (D.D.C. 2017) ("The challenged documents precede the final patentability decision and are part of the process by which that decision is made; they therefore are predecisional and deliberative.").

A document is "deliberative" if it "'reflects the give-and-take of the consultative process.'" *McKinley v. FDIC*, 744 F. Supp. 2d 128, 138 (D.D.C. 2010). Thus, "'pre-decisional materials are not exempt merely because they are pre-decisional; they also must be part of the agency give-and-take of the deliberative process by which the decision itself is made.'" *Jowett, Inc. v. Dep't of Navy*, 729 F. Supp. 871, 875 (D.D.C. 1989) (quoting *Vaughn v. Rosen*, 523 F.2d 1136, 1144 (D.C Cir. 1975)). The privilege protects factual material if it is "inextricably intertwined" with deliberative material, *FPL Grp.*, 698 F. Supp. 2d at 81, or if disclosure "would 'expose an agency's decision-making process in such a way as to discourage candid discussion within the agency and thereby undermine the agency's ability to perform its functions.'" *Quarles v. Dep't of Navy*, 893 F.2d 390, 392 (D.C. Cir. 1990) (quoting *Dudman Commc'ns Corp. v. Dep't of Air Force*, 815 F.2d 1565, 1568 (D.C. Cir. 1987)). "The 'key question' in identifying 'deliberative' material is whether disclosure of the information would 'discourage candid discussion within the agency.'" *Access Reports*, 926 F.2d at 1195.

The attorney-client privilege protects "confidential communications between an attorney and his client relating to a legal matter for which the client has sought professional advice." *Mead Data Cent. v Dep't of Air Force*, 566 F.2d 242, 252 (D.C. Cir. 1977). "Like the deliberative process privilege, the attorney-client privilege helps improve the quality of agency decision making by safeguarding the free flow of information that is a necessary predicate for sound advice." *Murphy v. Tenn. Valley Auth.*, 571 F. Supp. 502, 506 (D.D.C. 1983). The privilege applies "'primarily to facts divulged by client to attorney, but … also includes opinions from attorney to client based on those facts,'" *id.* (quoting *Brinton v. Dep't of State*, 636 F.2d 600, 605-06 (D.C. Cir. 1980)), "as well as communications between attorneys that reflect client-supplied information." *Elec. Privacy Info. Ctr. v. Dep't of Homeland Sec.*, 384 F. Supp. 2d 100, 114 (D.D.C. 2005).

The attorney-client privilege is "not limited to communications made in the context of litigation or even a specific dispute but extends to all situations in which an attorney's counsel is sought on a legal matter." *Coastal States*, 617 F.2d at 862. The agency has an affirmative obligation to show that the communication was, and continues to be, confidential, *id.* at 863; notably, however, limited circulation within an agency to employees involved in a matter for which advice is sought does not breach confidentiality. *Murphy*, 571 F. Supp. at 506. "The privilege applies to confidential communications made to an attorney by both high-level agency personnel and lower-echelon employees." *Elec. Privacy*, 384 F. Supp. 2d at 114.

Here, CBP applied Exemption 5 based on the deliberative process privilege to redact portions of emails between CBP employees and management with proposed analysis and recommendations regarding the encounter with Fraz Khan and a possible course of action. Suzuki Decl. ¶ 39. CBP also redacted language proposed by staff for the narrative contained in an I-213

record that management ultimately rejected (an I-213 form is entitled "Record of Deportable/ Inadmissible Alien"). *Id*. ¶ 40. The redacted information in this email and document was both pre-decisional and deliberative and properly withheld because its disclosure could reasonably be expected to compromise CBP investigations at the border and ports of entry and chill candid discussion among CBP staff in connection with the screening process. *Id*. ¶¶ 43-44. Thus, foreseeable harm would result from disclosure of the withheld information. *Id.*

In addition, CBP applied Exemption 5 based on the attorney-client privilege to redact information in specific emails between CBP's Office of Chief Counsel and CBP employees at DFW Airport regarding the January 3, 2021 inspection and legal issues regarding a phone battery. *Id*. ¶ 42. These emails involved an attorney supplying legal advice to CBP employees in response to legal advice the employees sought. *Id*. Thus, the information was properly withheld under Exemption 5 as disclosure of attorney-client information would chill employees from seeking legal advice and would assist bad actors seeking to enter this country in evading the law.[4] *Id*. ¶¶ 43-45. Thus, foreseeable harm would result from disclosure of the withheld information. *Id.*

---

[4]     CBP also relied on Exemption 5, based on the law enforcement investigatory privilege, to withhold in full twenty-two pages that also were withheld in full under Exemption 7(E) of FOIA based on the sensitive law enforcement information in those documents. Suzuki Decl. ¶¶ 46-48. The law enforcement privilege is recognized as a privilege in civil discovery, *Citizens for Responsibility and Ethics in Washington ("CREW") v. Dep't of Just.*, 658 F. Supp. 2d 217, 232 (D.D.C. 2009), and thus it necessarily should follow that it is a privilege on which Exemption 5 can be claimed. *See Jud. Watch, Inc. v. Dep't of Just.*, 365 F.3d 1108, 1113 (D.C. Cir. 2004) (the language of Exemption 5 "has been interpreted as protecting against disclosure those documents normally privileged in the civil discovery context"). However, the Court need not reach this issue because the twenty-two pages also are properly withheld in full under Exemption 7(E) as addressed below. *See CREW*, 658 F. Supp. 2d at 232 (declining to "reach the question of whether a law enforcement privilege should be recognized under Exemption 5" when the application of the privilege would be co-extensive with withholdings under Exemption 7 of FOIA).

### C.    CBP and ICE Properly Applied Exemptions 6, 7(C), 7(E) and/or 7(F)

#### 1.    Exemption 7 Threshold Requirement

Under Exemption 7, agencies can withhold "records or information compiled for law enforcement purposes, but only to the extent that the production of such law enforcement records or information" would create certain statutorily enumerated harms. 5 U.S.C. § 552(b)(7). As the Supreme Court has explained, "law enforcement includes not just the investigation and prosecution of offenses that have already been committed, but also proactive steps designed to prevent criminal activity and to maintain security." *Milner v. Dep't of Navy*, 562 U.S. 562, 582 (2011) (Alito, J., concurring); *see also PEER v. U.S. Section, Int'l Boundary & Water Comm'n*, U.S.-Mexico, 740 F.3d 195, 203 (D.C. Cir. 2014). The "law" to be enforced within the meaning of the term "law enforcement purposes" includes both civil and criminal statutes as well as those statutes authorizing regulatory proceedings. *PEER*, 740 F.3d at 203.

ICE and CBP each perform a law enforcement function in connection with their activities along the United States border, including at ports of entry. Suzuki Decl. ¶ 53; Howard Decl. ¶ 29; Pineiro Decl. ¶ 34. Thus, the records at issue were compiled for law enforcement purposes and satisfy the threshold requirement for withholding records under FOIA Exemption 7.

#### 2.    Exemptions 6 and 7(C) – Invasions of Personal Privacy

Exemption 6 protects "personnel and medical files and similar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(6). "The Supreme Court has interpreted the phrase 'similar files' to include all information that applies to a particular individual." *Lepelletier v. FDIC*, 164 F.3d 37, 46 (D.C. Cir. 1999) (quoting *Dep't of State v. Washington Post Co.*, 456 U.S. 595, 602 (1982)). The Supreme Court has also emphasized that "both the common law and the literal understanding of privacy encompass the individual's

control of information concerning his or her person." *Dep't of Just. v. Reporters Comm. for Freedom of Press*, 489 U.S. 749, 763 (1989).

To determine whether there would be a "clearly unwarranted invasion of personal privacy," the Court must balance the interests of protecting "an individual's private affairs from unnecessary public scrutiny," and "the public's right to governmental information." *Lepelletier*, 164 F.3d at 46 (interior quotation marks omitted) (citing *Dep't of Def. Dep't of Military Affs. v. Fed. Labor Rels. Auth.*, 964 F.2d 26, 29 (D.C. Cir. 1992) & *Dep't of Air Force v. Rose*, 425 U.S. 352, 372 (1976)).

In determining how to balance the private and public interests involved, the Supreme Court has sharply limited the notion of "public interest" under the FOIA:

> [T]he only relevant public interest in the FOIA balancing analysis [is] the extent to which disclosure of the information sought would 'she[d] light on an agency's performance of its statutory duties' or otherwise let citizens know 'what their government is up to.

*Lepelletier*, 164 F.3d at 46 (quoting *Dep't of Def. v. Fed. Labor Rels. Auth.*, 510 U.S. 487, 497 (1994)); *see also Reporters Comm.*, 489 U.S. at 773.  Information that does not directly reveal the operation or activities of the federal government "falls outside the ambit of the public interest that the FOIA was enacted to serve." *Id.* at 775.  Further, "something, even a modest privacy interest, outweighs nothing every time." *Nat'l Ass'n of Retired Fed. Employees v. Horner*, 879 F.2d 873, 879 (D.C. Cir. 1989).

Likewise, an agency may also withhold "records or information compiled for law enforcement purposes" if their production "could reasonably be expected to constitute an unwarranted invasion of personal privacy." 5 U.S.C. § 552(b)(7)(C).  "Exemption 7(C) requires the agency and the reviewing court to weigh the public interest in the release of information against the privacy interest in nondisclosure." *Schrecker v. Dep't of Just.*, 349 F.3d 657, 661 (D.C. Cir. 2003) (citing *Reporters Comm.*, 489 U.S. at 762); *see also Reporters Comm.*, 489 U.S. at 776-80.

A plaintiff must (1) "show that the public interest sought to be advanced is a significant one, an interest more specific than having the information for its own sake," and (2) "show the information is likely to advance that interest." *Nat'l Archives & Records Admin. v. Favish*, 541 U.S. 157, 172 (2004)).  It is the "interest of the general public, and not that of the private litigant" that is considered in this analysis. *Ditlow v. Shultz*, 517 F.2d 166, 171–72 (D.C. Cir. 1975).  The public interest in disclosure refers to "open[ing] agency action to the light of public scrutiny." *Oguaju v. United States*, 288 F.3d 448, 450 (D.C. Cir. 2002) (quoting *Reporters Comm.*, 489 U.S. at 772).

Even though CBP and ICE invoked both Exemption 6 and 7(C), courts focus primarily on Exemption 7(C) because "it is more protective of privacy than Exemption 6 and thus establishes a lower bar for withholding material." *Shapiro v. CIA*, 247 F. Supp. 3d 53, 66 (D.D.C. 2017) (quoting *ACLU v. Dep't of Just.*, 655 F.3d 1, 6 (D.C. Cir. 2011) ("Although the [defendant] relied on both exemptions . . . we need only consider whether it properly invoked Exemption 7(C).")).

In this case, CBP and ICE applied Exemption 6 and 7(C) to withhold personally identifiable information, such as names and phone numbers of law enforcement personnel and other government employees and personal information regarding third parties. Suzuki Decl. ¶ 50; Howard Decl. ¶ 30; Baxley Decl. ¶ 39.  Courts recognize that the name of government personnel can be redacted on Exemption 6 and 7(C) grounds even when their names appear in government records in connection with their government employment.  *See, e.g., Davidson v. Dep't of State*, 206 F. Supp. 3d 178, 200 (D.D.C. 2016) ("because Mr. Davidson has made no argument asserting a public interest in knowing the [agency's] employees' name and contact information, . . . the Court determines that no public interest exists to justify disclosure of the employees' name and contact information").  Likewise, identifying information of third parties also is properly withheld

under these exemptions. *Skybridge Spectrum Found. v. FCC*, 842 F. Supp. 2d 65, 84 n.9 (D.D.C. 2012) ("Skybridge argued that 'Exemption 6 is inapplicable to corporations and other institutional entities which are not natural persons.' . . . While that is undeniably true, it is irrelevant because the information that the FCC has withheld includes the names and personal identifying information of natural persons.").

On the other hand, CBP and ICE found little to no public interest in the withheld information, let alone an interest sufficient to outweigh the privacy interest in non-disclosure. Suzuki Decl. ¶ 59; Howard Decl. ¶ 31; Pineiro Decl. ¶ 44. Accordingly, these withholdings under Exemptions 6 and 7(C) should be upheld.

### 3.    Exemption 7(E)

As already addressed above, FOIA Exemption 7(E) authorizes agencies to withhold "records or information compiled for law enforcement purposes [that] would disclose techniques and procedures for law enforcement investigations or prosecutions, or would disclose guidelines for law enforcement investigations or prosecutions if such disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E).

"[T]he exemption looks not just for circumvention of the law, but for a risk of circumvention; not just for an actual or certain risk of circumvention, but for an expected risk; not just for an undeniably or universally expected risk, but for a reasonably expected risk; and not just for certitude of a reasonably expected risk, but for the chance of a reasonably expected risk." *Mayer Brown LLP v. IRS*, 562 F.3d 1190, 1193 (D.C. Cir. 2009). The D.C. Circuit has also stated that "under [its] precedents Exemption 7(E) sets a relatively low bar for the agency to justify withholding: 'Rather than requiring a highly specific burden of showing how the law will be circumvented, exemption 7(E) only requires that the [agency] demonstrate logically how the

release of the requested information might create a risk of circumvention of the law.'" *Blackwell v. FBI*, 646 F.3d 37, 42 (D.C. Cir. 2011) (quoting *Mayer Brown LLP*, 562 F.3d at 1194).

"An agency may seek to block the disclosure of internal agency materials relating to guidelines, techniques, sources, and procedures for law enforcement investigations and prosecutions, even when the materials have not been compiled in the course of a specific investigation." *Tax Analysts v. IRS*, 294 F.3d 71, 79 (D.C. Cir. 2002). Even if withheld documents "are not 'how-to' manuals for law-breakers, the exemption is broader than that." *Mayer Brown LLP*, 562 F.3d at 1192–93.

CBP and ICE applied Exemption 7(E) to redact from documents the following types of information, among others: sensitive links to law enforcement databases and/or systems, internal codes, case codes, case numbers, other case tracking information, access location of law enforcement systems and records, record identification numbers, results of law enforcement database queries, and descriptions of the underlying law enforcement reasons for CBP's actions during inspections at a port of entry. Suzuki Decl. ¶¶ 64-66; Howard Decl. ¶¶ 35-37; Pineiro Decl. ¶¶ 47-48. This information, if disclosed, could be used to circumvent the law by compromising the integrity of CBP and ICE databases, including enabling improper access to such systems. *Id.*

CBP also withheld in full a twenty-two page PowerPoint under Exemption 7(E). Suzuki Decl. ¶¶ 67-70. As explained on CBP's *Vaughn* Index, this record was withheld in full under 7(E) because the record includes information regarding investigations of specific instances of suspected unlawful activity, including the techniques utilized, information uncovered, and the area of interest as well as depiction of the tools' functionality utilized by CBP to analyze information. *See Vaughn* Index (Ex. A to Suzuki Decl.) at 45-46; Suzuki Decl. ¶¶ 67-70. This information contains specific details of a law enforcement investigation, including dates of interest and target locations.

Disclosure of such information, either standing alone or combined with other available information, would be debilitating and detrimental to CBP and the law enforcement community, as it would enable subjects of interest to alter their behavior or patterns of conduct, relocate, adopt new methods of criminal operation, or effectuate other countermeasures to engage in violations of law and evade law enforcement detection. *Id.*

Accordingly, CBP and ICE properly withheld the identified categories of information under Exemption 7(E) and CBP properly withheld the twenty-two page PowerPoint in full.

4.    Exemption 7(F)

Exemption 7(F) protects law enforcement information that "could reasonably be expected to endanger the life or physical safety of any individual." 5 U.S.C. § 552(b)(7)(F). CBP withheld the names of third parties under Exemption 7(F) in addition to Exemption 7(C). Suzuki Decl. ¶¶ 73-75. The resolution of withholdings under Exemptions 6 and 7(C) are dispositive of Exemption 7(F), as well, but in any event protecting the privacy of a person whose life could be in danger if disclosed is proper. *See Kowal*, 107 F.4th at 1029 n.3. Accordingly, CBP properly withheld information under Exemption 7(F).

**IV.    CBP and ICE Have Complied with FOIA's Segregability Requirement**

Under the FOIA, if a record contains information exempt from disclosure, any "reasonably segregable," non-exempt information subject to FOIA must be disclosed after redaction of the exempt information. 5 U.S.C. § 552(b). Non-exempt portions of records need not be disclosed if they are "inextricably intertwined with exempt portions." *Mead Data Cent., Inc. v. Dep't of Air Force*, 566 F.2d 242, 260 (D.C. Cir. 1977). To establish that all reasonably segregable, non-exempt information has been disclosed, an agency need only show "with 'reasonable specificity'" that the information it has withheld cannot be further segregated. *Armstrong v. Exec. Office of the President*, 97 F.3d 575, 578-79 (D.C. Cir. 1996); *Canning v. Dep't of Just.*, 567 F. Supp. 2d 104,

110 (D.D.C. 2008). "Agencies are entitled to a presumption that they complied with the obligation to disclose reasonably segregable material," which must be overcome by some "quantum of evidence" by the requester. *Sussman v. Marshals Serv.*, 494 F.3d 1106, 1117 (D.C. Cir. 2007); "The combination of the *Vaughn* index and the affidavits . . . are sufficient to fulfill the agency's obligation to show with 'reasonable specificity' why a document cannot be further segregated." *Johnson v. Exec. Off. for U.S. Att'ys*, 310 F.3d 771, 776 (D.C. Cir. 2002); *see also Loving v. Dep't of Def.*, 550 F.3d 32, 41 (D.C. Cir. 2008) ("Here the district court relied on the very factors that we have previously deemed sufficient for this determination, i.e., the description of the document set forth in the *Vaughn* index and the agency's declaration that it released all segregable material."); *Elec. Privacy Info. Ctr. v. Dep't of Just.*, 320 F. Supp. 3d 110, 120-21 (D.D.C. 2018) (same); *Anguimate v. Dep't of Homeland Sec.*, 918 F. Supp. 2d 13, 22 (D.D.C. 2013) (same).

Here, the declarants of ICE and CBP have attested that a line-by-line review was conducted to determine whether further segregation was possible without causing a foreseeable harm to the agency or the other interests protected by the applicable exemptions and that all reasonably segregable, non-exempt information has been provided, coupled with an extensive *Vaughn* Index describing the withholdings. Suzuki Decl. ¶ 76; Howard Decl. ¶ 39; Pineiro Decl. ¶¶ 51-52. That is sufficient to satisfy their burden. *Amadis v. Dep't of State*, 971 F.3d 364, 371-72 (D.C. Cir. 2020); *see also Emuwa v. Dep't of Homeland Sec.*, 113 F.4th 1009, 1017 (D.C. Cir. 2024).

*    *    *

## CONCLUSION

For these reasons, Defendants' motion for summary judgment should be granted and this action dismissed with prejudice.

Dated: March 18, 2025

Respectfully submitted,

EDWARD R. MARTIN, JR., D.C. Bar #481866
United States Attorney

By:  _____/s/ Jeremy S. Simon_____

JEREMY S. SIMON
Assistant United States Attorney
601 D Street, NW
Washington, DC 20530
202-252-2528

*Attorneys for the United States of America*